(Slip Opinion)          OCTOBER TERM, 2011          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL MEAT ASSOCIATION *v.* HARRIS, ATTORNEY GENERAL OF CALIFORNIA, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–224.   Argued November 9, 2011—Decided January 23, 2012

The Federal Meat Inspection Act (FMIA), 21 U. S. C. §601 *et seq.*, regulates a broad range of activities at slaughterhouses to ensure the safety of meat and the humane handling of animals.  The Department of Agriculture's Food Safety and Inspection Service (FSIS), which administers the FMIA, has issued extensive regulations to govern the inspection of animals and meat, as well as other aspects of slaughterhouses' operations and facilities.  See 9 CFR §300.1 *et seq.* The FSIS inspection procedure begins with an "ante-mortem" inspection of each animal brought to a slaughterhouse.  If, at that inspection, a nonambulatory animal is found to suffer from a particularly severe disease or condition, it must be classified as "U. S. Condemned" and killed apart from the slaughtering facilities where food is produced.  §§309.3, 311.1 *et seq.*  Nonambulatory animals that are not condemned are classified as "U. S. Suspect." §309.2(b).  They are set apart, specially monitored, and "slaughtered separately from other livestock." §309.2(n).  Following slaughter, an inspector decides at a "post-mortem" examination which parts, if any, of the suspect animal's carcass may be processed into food for humans. See 9 CFR pts. 310, 311.  FSIS regulations additionally prescribe methods for handling animals humanely at all stages of the slaughtering process, 9 CFR pt. 313, including specific provisions for the humane treatment of nonambulatory animals, 9 CFR 313.2(d).

The FMIA's preemption clause, §678, precludes states from imposing requirements that are "within the scope" of the FMIA, relate to slaughterhouse "premises, facilities and operations," and are "in addition to, or different than those made under" the FMIA.  In 2008, California amended its penal code to provide that no slaughterhouse

shall "buy, sell, or receive a nonambulatory animal"; "process, butch-
er, or sell meat or products of nonambulatory animals for human
consumption"; or "hold a nonambulatory animal without taking im-
mediate action to humanely euthanize the animal." §§599f(a)–(c).
Petitioner National Meat Association (NMA), a trade association rep-
resenting meatpackers and processors, sued to enjoin enforcement of
§599f against swine slaughterhouses, arguing that the FMIA
preempts application of the state law. The District Court agreed, and
granted the NMA a preliminary injunction. The Ninth Circuit re-
versed, holding that §599f is not preempted because it regulates only
"the kind of animal that may be slaughtered," not the inspection or
slaughtering process itself.

*Held:* The FMIA expressly preempts §599f's application against federal-
ly inspected swine slaughterhouses. Pp. 6−14.

   (a) The FMIA's preemption clause sweeps widely, and so blocks the
applications of §599f challenged here. The clause prevents a State
from imposing any additional or different—even if nonconflict-
ing—requirements that fall within the FMIA's scope and concern
slaughterhouse facilities or operations. Section 599f imposes addi-
tional or different requirements on swine slaughterhouses: Where
under federal law a slaughterhouse may take one course of action in
handling a nonambulatory pig, under state law the slaughterhouse
must take another. For example, when a pig becomes injured and
thus nonambulatory sometime after delivery to a slaughterhouse,
§599f(c) prohibits the slaughterhouse from "hold[ing]" the pig without
immediately euthanizing it; and §599f(b) prohibits the slaughter-
house from "process[ing]" or "butcher[ing]" the animal to make food.
By contrast, the FMIA and its regulations allow a slaughterhouse to
hold (without euthanizing) any nonambulatory animal that has not
been condemned, and to process and butcher such an animal's meat,
subject to an FSIS official's approval at post-mortem inspection. Sim-
ilarly, when a pig is nonambulatory at the time of delivery, §599f(a)
prohibits a slaughterhouse from "receiv[ing]" or "buy[ing]" the pig.
But the FMIA and its regulations expressly allow slaughterhouses to
purchase nonambulatory pigs. See 21 U. S. C. §644; 9 CFR
§325.20(c). And the FSIS inspection regime clearly contemplates
that slaughterhouses will receive nonambulatory animals. So §599f
substitutes a new regulatory regime for the one the FMIA prescribes.

   Respondent Humane Society argues that §599f(a)'s ban on pur-
chasing nonambulatory animals escapes preemption because it would
not be preempted if applied to purchases occurring off slaughterhouse
premises. But the record does not disclose whether §599f(a) ever ap-
plies beyond the slaughterhouse gate, much less how an application
of that kind would affect a slaughterhouse's operations. Moreover,

even if the State could regulate off-site purchases, it does not follow
that on-site purchases would escape preemption, because the FMIA's
preemption clause expressly focuses on slaughterhouse "premises, fa-
cilities and operations." And while the Humane Society is correct
that the FMIA does not normally regulate slaughterhouse sales activ-
ities, §599f's sales ban serves to regulate how slaughterhouses must
handle nonambulatory pigs on their premises. Its effect is to make
sure that slaughterhouses remove nonambulatory pigs from the pro-
duction process. It is therefore preempted by the FMIA. Pp. 6–10.

  (b) Also rejected is the broad argument that §599f's challenged pro-
visions fall outside the FMIA's scope because they exclude a class of
animals from the slaughtering process, while the FMIA extends only
to "animals that are going to be turned into meat." In fact, the FMIA
regulates animals on slaughterhouse premises that will never be
turned into meat. For example, the Act's implementing regulations
exclude many classes of animals from the slaughtering process, *e.g.*,
swine with hog cholera, 9 CFR §309.5(a). The argument that §599f's
exclusion avoids the FMIA's scope because it is designed to ensure
the humane treatment of pigs, rather than meat safety, misunder-
stands the FMIA's scope. The FMIA addresses not just food safety,
but humane treatment, as well. See, *e.g.,* 21 U. S. C. §§603, 610(b).
Pp. 11–14.

599 F. 3d 1093, reversed and remanded.

  KAGAN, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–224

_____

## NATIONAL MEAT ASSOCIATION, PETITIONER *v.* KAMALA D. HARRIS, ATTORNEY GENERAL OF CALIFORNIA, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[January 23, 2012]

JUSTICE KAGAN delivered the opinion of the Court.

The Federal Meat Inspection Act (FMIA or Act), 21 U. S. C. §601 *et seq*., regulates the inspection, handling, and slaughter of livestock for human consumption.  We consider here whether the FMIA expressly preempts a California law dictating what slaughterhouses must do with pigs that cannot walk, known in the trade as nonambulatory pigs.  We hold that the FMIA forecloses the challenged applications of the state statute.

I

A

The FMIA regulates a broad range of activities at slaughterhouses to ensure both the safety of meat and the humane handling of animals.[1]  First enacted in 1906, after

_____

[1] The FMIA applies to all slaughterhouses producing meat for interstate and foreign commerce.  See 21 U. S. C. §§601(h), 603(a).  The FMIA also regulates slaughterhouses serving an exclusively intrastate market in any State that does not administer an inspection system with "requirements at least equal to those" of the Act.  §661(c)(1).  Because California has chosen not to adopt such an inspection program,

Upton Sinclair's muckraking novel *The Jungle* sparked an uproar over conditions in the meatpacking industry, the Act establishes "an elaborate system of inspecti[ng]" live animals and carcasses in order "to prevent the shipment of impure, unwholesome, and unfit meat and meat-food products." *Pittsburgh Melting Co.* v. *Totten*, 248 U. S. 1, 4–5 (1918). And since amended in 1978, see 92 Stat. 1069, the FMIA requires all slaughterhouses to comply with the standards for humane handling and slaughter of animals set out in the Humane Methods of Slaughter Act of 1958, (HMSA), 72 Stat. 862, 7 U. S. C. §1901 *et seq.*, which originally applied only to slaughterhouses selling meat to the Federal Government.

The Department of Agriculture's Food Safety and Inspection Service (FSIS) has responsibility for administering the FMIA to promote its dual goals of safe meat and humane slaughter. Over the years, the FSIS has issued extensive regulations to govern the inspection of animals and meat, as well as other aspects of slaughterhouses' operations and facilities. See 9 CFR §300.1 *et seq.* (2011). The FSIS employs about 9,000 inspectors, veterinarians, and investigators to implement its inspection regime and enforce its humane-handling requirements. See Hearings on 2012 Appropriations before the Subcommittee on Agriculture of the House Committee on Appropriations, 112th Cong., 1st Sess., pt. 1B, p. 921 (2011). In fiscal year 2010, those personnel examined about 147 million head of livestock and carried out more than 126,000 "humane handling verification procedures." *Id.*, at 942–943.

The FSIS's inspection procedure begins with an "antemortem" examination of each animal brought to a slaughterhouse. See 9 CFR §309.1. If the inspector finds no

————————

the FMIA governs all slaughterhouses in the State (except for any limited to "custom slaughtering for personal, household, guest, and employee uses," §623(a)).

evidence of disease or injury, he approves the animal for slaughter. If, at the other end of the spectrum, the inspector sees that an animal is dead or dying, comatose, suffering from a high fever, or afflicted with a serious disease or condition, he designates the animal as "U. S. Condemned." See §309.3; §311.1 *et seq.* (listing diseases requiring condemnation). A condemned animal (if not already dead) must be killed apart from the slaughtering facilities where food is produced, and no part of its carcass may be sold for human consumption. See §309.13(a); 21 U. S. C. §610(c).

The inspector also has an intermediate option: If he determines that an animal has a less severe condition—or merely suspects the animal of having a disease meriting condemnation—he classifies the animal as "U. S. Suspect." See 9 CFR §309.2. That category includes all nonambulatory animals not found to require condemnation.[2] See §309.2(b). Suspect livestock must be "set apart," specially monitored, and (if not reclassified because of a change in condition) "slaughtered separately from other livestock." §309.2(n). Following slaughter, an inspector decides at a "post-mortem" examination which parts, if any, of the suspect animal's carcass may be processed into food for humans. See 9 CFR pts. 310, 311.

The regulations implementing the FMIA additionally prescribe methods for handling animals humanely at all stages of the slaughtering process. Those rules apply from the moment a truck carrying livestock "enters, or is in line to enter," a slaughterhouse's premises. Humane Handling and Slaughter of Livestock, FSIS Directive 6900.2, ch. II(I) (rev. Aug. 15, 2011). And they include specific provisions for the humane treatment of animals that cannot walk.

―――――――――

[2] The FSIS's regulations define "non-ambulatory disabled livestock" as "livestock that cannot rise from a recumbent position or that cannot walk, including, but not limited to, those with broken appendages, severed tendons or ligaments, nerve paralysis, fractured vertebral column, or metabolic conditions." §309.2(b).

See 9 CFR §313.2(d).  Under the regulations, slaughter-house employees may not drag conscious, nonambulatory animals, see §313.2(d)(2), and may move them only with "equipment suitable for such purposes," §313.2(d)(3). Similarly, employees must place nonambulatory animals, as well as other sick and disabled livestock, in covered pens sufficient to protect the animals from "adverse climatic conditions."  See §313.2(d)(1); §313.1(c).

The FMIA contains an express preemption provision, at issue here, addressing state laws on these and similar matters.  That provision's first sentence reads:

> "Requirements within the scope of this [Act] with respect to premises, facilities and operations of any establishment at which inspection is provided under . . . this [Act] which are in addition to, or different than those made under this [Act] may not be imposed by any State."  21 U. S. C. §678.[3]

B

In 2008, the Humane Society of the United States released an undercover video showing workers at a slaughterhouse in California dragging, kicking, and electro-shocking sick and disabled cows in an effort to move them. The video led the Federal Government to institute the largest beef recall in U. S. history in order to prevent consumption of meat from diseased animals.  Of greater relevance here, the video also prompted the California legislature to strengthen a pre-existing statute governing the treatment of nonambulatory animals and to apply that statute to slaughterhouses regulated under the FMIA. See *National Meat Assn.* v. *Brown*, 599 F. 3d 1093, 1096

---

[3] The preemption provision also includes a saving clause, which states that the Act "shall not preclude any State . . . from making requirement[s] or taking other action, consistent with this [Act], with respect to any other matters regulated under this [Act]."  21 U. S. C. §678; see n. 10, *infra.*

(CA9 2010).

As amended, the California law—§599f of the state penal code—provides in relevant part:

> "(a) No slaughterhouse, stockyard, auction, market agency, or dealer shall buy, sell, or receive a nonambulatory animal.
>
> "(b) No slaughterhouse shall process, butcher, or sell meat or products of nonambulatory animals for human consumption.
>
> "(c) No slaughterhouse shall hold a nonambulatory animal without taking immediate action to humanely euthanize the animal." Cal. Penal Code Ann. §599f (West 2010).

The maximum penalty for violating any of these prohibitions is one year in jail and a $20,000 fine. See §599f(h).

Petitioner National Meat Association (NMA) is a trade association representing meatpackers and processors, including operators of swine slaughterhouses. It sued to enjoin the enforcement of §599f against those slaughterhouses, principally on the ground that the FMIA preempts application of the state law.[4] The District Court granted the NMA's motion for a preliminary injunction, reasoning that §599f is expressly preempted because it requires swine "to be handled in a manner other than that prescribed by the FMIA" and its regulations. App. to Pet. for Cert. 36a. But the United States Court of Appeals for the Ninth Circuit vacated the injunction. According to that court, the FMIA does not expressly preempt §599f because the state law regulates only "the kind of animal that may be slaughtered," and not the inspection or slaughtering process itself. 599 F. 3d, at 1098.

We granted certiorari, 564 U. S. \_\_ (2011), and now

-------------

[4] The Humane Society intervened to defend §599f in the District Court. See Motion to Intervene in No. 08–1963 (ED Cal.), Record, Doc. 46. The organization continues as a respondent in this Court.

reverse.

## II

The FMIA's preemption clause sweeps widely—and in so doing, blocks the applications of §599f challenged here. The clause prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act and concern a slaughterhouse's facilities or operations. And at every turn §599f imposes additional or different requirements on swine slaughterhouses: It compels them to deal with nonambulatory pigs on their premises in ways that the federal Act and regulations do not. In essence, California's statute substitutes a new regulatory scheme for the one the FSIS uses. Where under federal law a slaughterhouse may take one course of action in handling a nonambulatory pig, under state law the slaughterhouse must take another.

Consider first what the two statutes tell a slaughterhouse to do when (as not infrequently occurs) a pig becomes injured and thus nonambulatory sometime after delivery to the slaughterhouse.[5] Section 599f(c) prohibits the slaughterhouse from "hold[ing]" such an animal "without taking immediate action to humanely euthanize" it. And §599f(b) provides that no part of the animal's carcass may be "process[ed]" or "butcher[ed]" to make food. By contrast, under the FMIA and its regulations, a slaughterhouse may hold (without euthanizing) any nonambulatory pig that has not been condemned. See *supra,* at 3. And the slaughterhouse may process or butcher such an

—————

[5] The percentage of pigs becoming nonambulatory after delivery varies by slaughterhouse from 0.1 percent to over 1 percent. See McGlone, Fatigued Pigs: The Final Link, Pork Magazine 14 (Mar. 2006). About 100 million pigs are slaughtered each year in the United States, see Dept. of Agriculture, National Agricultural Statistics Service, Livestock Slaughter 13 (Jan. 2011), so those percentages work out to between 100,000 and 1,000,000 pigs.

animal's meat for human consumption, subject to an FSIS official's approval at a post-mortem inspection. See *ibid.* The State's proscriptions thus exceed the FMIA's. To be sure, nothing in the federal Act requires what the state law forbids (or forbids what the state law requires); California is right to note that "[t]he FMIA does not mandate that 'U. S. Suspect' [nonambulatory] animals . . . be placed into the human food production process." Brief for State Respondents 31. But that is irrelevant, because the FMIA's preemption clause covers not just conflicting, but also different or additional state requirements. It therefore precludes California's effort in §§599f(b) and (c) to impose new rules, beyond any the FSIS has chosen to adopt, on what a slaughterhouse must do with a pig that becomes nonambulatory during the production process.

Similarly, consider how the state and federal laws address what a slaughterhouse should do when a pig is nonambulatory at the time of delivery, usually because of harsh transportation conditions.[6] Section 599f(a) of the California law bars a slaughterhouse from "receiv[ing]" or "buy[ing]" such a pig, thus obligating the slaughterhouse to refuse delivery of the animal.[7] But that directive, too, deviates from any imposed by federal law. A regulation issued under the FMIA specifically authorizes slaughterhouses to buy disabled or diseased animals (including nonambulatory swine), by exempting them from a general prohibition on such purchases. See 9 CFR §325.20(c).

––––––––

[6] According to one estimate, almost half of one percent of the pigs slaughtered annually in the United States become nonambulatory during the trip from farm to slaughterhouse. See National Pork Board, Transport Quality Assurance Handbook 25 (Version 4, 2010). About half that many die during transport. See *ibid.*

[7] Section 599f(a) also bans "sell[ing]" nonambulatory animals. But because slaughterhouses (unlike other entities referenced in the provision) do not typically sell live animals, that prohibition is not at issue in this case. The statute's distinct ban on selling *meat* from nonambulatory animals that have been slaughtered is discussed *infra,* at 9–10.

And other regulations contemplate that slaughterhouses will in fact take, rather than refuse, receipt of nonambulatory swine. Recall that the FMIA's regulations provide for the inspection of all pigs at delivery, see *supra,* at 2—in the case of nonambulatory pigs, often right on the truck, see Humane Handling and Slaughter of Livestock, FSIS Directive 6900.2, ch. II(I). They further instruct slaughterhouses to kill and dispose of any nonambulatory pigs labeled "condemned," and to slaughter separately those marked "suspect." See *supra,* at 3. In short, federal law establishes rules for handling and slaughtering nonambulatory pigs brought to a slaughterhouse, rather than ordering them returned to sender. So §599f(a) and the FMIA require different things of a slaughterhouse confronted with a delivery truck containing nonambulatory swine. The former says "do not receive or buy them"; the latter does not.

The Humane Society counters that at least §599f(a)'s ban on buying nonambulatory animals escapes preemption because that provision applies no matter when or where a purchase takes place. The argument proceeds in three steps: (1) §599f(a)'s ban covers purchases of nonambulatory pigs made prior to delivery, away from the slaughterhouse itself (say, at a farm or auction); (2) the State may regulate such offsite purchases because they do not involve a slaughterhouse's "premises, facilities and operations," which is a condition of preemption under the FMIA; and (3) no different result should obtain just because a slaughterhouse structures its swine purchases to occur at delivery, on its own property. See Brief for Non-State Respondents 43–45.

But this argument fails on two grounds. First, its preliminary steps have no foundation in the record. Until a stray comment at oral argument, see Tr. of Oral Arg. 50, neither the State nor the Humane Society had disputed the NMA's assertion that slaughterhouses buy pigs at

delivery (or still later, upon successful ante-mortem in-
spection). See Brief for Petitioner 46, n. 18; Brief for Non-
State Respondents 44; Brief for State Respondents 16,
n. 5. Nor had the parties presented evidence that a signif-
icant number of pigs become nonambulatory before ship-
ment, when any offsite purchases would occur. The record
therefore does not disclose whether §599f(a)'s ban on
purchase ever applies beyond the slaughterhouse gate,
much less how an application of that kind would affect
a slaughterhouse's operations. And because that is so,
we have no basis for deciding whether the FMIA would
preempt it. Second, even assuming that a State could
regulate offsite purchases, the concluding step of the
Humane Society's argument would not follow. The FMIA's
preemption clause expressly focuses on "premises, facili-
ties and operations"—at bottom, the slaughtering and
processing of animals at a given location. So the distinc-
tion between a slaughterhouse's site-based activities and
its more far-flung commercial dealings is not, as the Hu-
mane Society contends, an anomaly that courts should
strain to avoid. It is instead a fundamental feature of the
FMIA's preemption clause.

For that reason, the Humane Society's stronger argu-
ment concerns California's effort to regulate the *last* stage
of a slaughterhouse's business—the ban in §599f(b) on
"sell[ing] meat or products of nonambulatory animals for
human consumption." The Government acknowledges
that the FMIA's preemption clause does not usually fore-
close "state regulation of the commercial sales activities of
slaughterhouses." Brief for United States as *Amicus
Curiae* 17. And the Humane Society asserts, in line with
that general rule, that §599f(b)'s ban on sales does not
regulate a slaughterhouse's "operations" because it kicks
in only after they have ended: Once meat from a slaugh-
tered pig has passed a post-mortem inspection, the Act
"is not concerned with whether or how it is ever actually

sold."  Brief for Non-State Respondents 45.  At most, the Humane Society claims, §599f(b)'s ban on sales offers an "incentiv[e]" to a slaughterhouse to take nonambulatory pigs out of the meat production process.  *Id.,* at 46.  And California may so "motivate[]" an operational choice without running afoul of the FMIA's preemption provision. *Ibid.* (quoting *Bates* v. *Dow Agrosciences LLC,* 544 U. S. 431, 443 (2005)).

But this argument mistakes how the prohibition on sales operates within §599f as a whole.  The sales ban is a criminal proscription calculated to help implement and enforce each of the section's other regulations—its prohibition of receipt and purchase, its bar on butchering and processing, and its mandate of immediate euthanasia. The idea—and the inevitable effect—of the provision is to make sure that slaughterhouses remove nonambulatory pigs from the production process (or keep them out of the process from the beginning) by criminalizing the sale of their meat.  That, we think, is something more than an "incentive" or "motivat[or]"; the sales ban instead functions as a command to slaughterhouses to structure their operations in the exact way the remainder of §599f mandates.  And indeed, if the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved.  That would make a mockery of the FMIA's preemption provision.  Cf. *Engine Mfrs. Assn.* v. *South Coast Air Quality Management Dist.,* 541 U. S. 246, 255 (2004) (stating that it "would make no sense" to allow state regulations to escape preemption because they addressed the purchase, rather than manufacture, of a federally regulated product).  Like the rest of §599f, the sales ban regulates how slaughterhouses must deal with nonambulatory pigs on their premises.  The FMIA therefore preempts it for all the same reasons.

### III

California's and the Humane Society's broadest argument against preemption maintains that all of §599f's challenged provisions fall outside the "scope" of the FMIA because they exclude a class of animals from the slaughtering process. See 21 U. S. C. §678 (preempting certain requirements "within the scope of this [Act]"). According to this view, the Act (and the FSIS's authority under it) extends only to "animals that are going to be turned into meat," Tr. of Oral Arg. 28—or to use another phrase, animals that will "be slaughtered . . . for purposes of human food production," Brief for State Respondents 19 (emphasis deleted). Section 599f avoids the scope of the Act, respondents claim, by altogether removing nonambulatory pigs from the slaughtering process.[8] The Ninth Circuit accepted this argument, analogizing §599f to state laws upheld in two other Circuits banning the slaughter of horses for human consumption. 599 F. 3d, at 1098 (discussing *Cavel Int'l., Inc.* v. *Madigan,* 500 F. 3d 551 (CA7 2007), and *Empacadora de Carnes de Fresnillo, S. A. de C.V.* v. *Curry,* 476 F. 3d 326 (CA5 2007)). According to the Court of Appeals, "states are free to decide which animals may be turned into meat." 599 F. 3d, at 1098, 1099.

We think not. The FMIA's scope includes not only "animals that are going to be turned into meat," but ani-

---

[8] California's brief sometimes casts its argument in terms of the "operations" language of the FMIA's preemption clause (although the State appeared to abandon this phrasing at oral argument). In this version of the claim, California contends that the "operations" of a slaughterhouse are only those "of federal concern," and that excluding a class of animals from the slaughtering process does not impinge on such operations. Brief for State Respondents 20, n. 9; see also *id.*, at 20–21. We see no real difference between saying that a categorical exclusion of animals does not implicate "operations of federal concern" and saying that it does not fall within the scope of the Act. Accordingly, our answer to both forms of the argument is the same.

mals on a slaughterhouse's premises that will never suffer that fate. The Act's implementing regulations themselves exclude many classes of animals from the slaughtering process. Swine with hog cholera, for example, are disqualified, see 9 CFR §309.5(a); so too are swine and other livestock "affected with anthrax," §309.7(a). Indeed, the federal regulations prohibit the slaughter of any nonambulatory *cattle* for human consumption. See §309.3(e). As these examples demonstrate, one vital function of the Act and its regulations is to ensure that some kinds of livestock delivered to a slaughterhouse's gates will *not* be turned into meat. Under federal law, nonambulatory pigs are not among those excluded animals. But that is to say only that §599f's requirements differ from those of the FMIA—not that §599f's requirements fall outside the FMIA's scope.

Nor are respondents right to suggest that §599f's exclusion avoids the FMIA's scope because it is designed to ensure the humane treatment of pigs, rather than the safety of meat. See, *e.g.,* Brief for State Respondents 29; Brief for Non-State Respondents 39–40. That view misunderstands the authority—and indeed responsibility—that the FMIA gives to federal officials. Since 1978, when Congress incorporated the HMSA's standards, the FMIA has required slaughterhouses to follow prescribed methods of humane handling, so as to minimize animals' pain and suffering. See 21 U. S. C. §§603(b), 610(b); *supra,* at 2–4. A violation of those standards is a crime, see §676, and the Secretary of Agriculture can suspend inspections at—and thus effectively shut down—a slaughterhouse that disobeys them, see §§603(b), 610(c). To implement the Act's humane-handling provisions, the FSIS has issued detailed regulations, see 9 CFR pt. 313, including some specifically addressing animals that cannot walk, see §§313.2(d), 313.1(c). Those rules, as earlier noted, apply throughout the time an animal is on a slaughterhouse's premises,

from the moment a delivery truck pulls up to the gate. See *supra,* at 3–4. So the FMIA addresses not just food safety, but humane treatment as well. Even California conceded at oral argument that the FSIS could issue regulations under the FMIA, similar to §599f, mandating the euthanasia of nonambulatory swine.[9] See Tr. of Oral Arg. 46–47. If that is so—and it is, because of the FSIS's authority over humane-handling methods—then §599f's requirements must fall within the FMIA's scope.

The Circuit decisions upholding state bans on slaughtering horses, on which the Ninth Circuit relied, do not demand any different conclusion. We express no view on those decisions, except to say that the laws sustained there differ from §599f in a significant respect. A ban on butchering horses for human consumption works at a remove from the sites and activities that the FMIA most directly governs. When such a ban is in effect, no horses will be delivered to, inspected at, or handled by a slaughterhouse, because no horses will be ordered for purchase in the first instance. But §599f does not and cannot work in that way. As earlier noted, many nonambulatory pigs become disabled either in transit to or after arrival at a slaughterhouse. See *supra,* at 6–9, and nn. 5–6. So even with §599f in effect, a swine slaughterhouse will encounter nonambulatory pigs. In that circumstance, §599f tells the slaughterhouse what to do with those animals. Unlike a horse slaughtering ban, the statute thus reaches into the slaughterhouse's facilities and affects its daily activities. And in so doing, the California law runs smack into the FMIA's regulations. So whatever might be said of other bans on slaughter, §599f imposes requirements within—

--------

[9] Indeed, the FSIS recently solicited comment on a rulemaking petition that would require all nonambulatory disabled livestock, including swine, to be humanely euthanized. See 76 Fed. Reg. 6572 (2011). The FSIS has taken no further action on that petition.

and indeed at the very heart of—the FMIA's scope.[10]

## IV

The FMIA regulates slaughterhouses' handling and treatment of nonambulatory pigs from the moment of their delivery through the end of the meat production process. California's §599f endeavors to regulate the same thing, at the same time, in the same place—except by imposing different requirements. The FMIA expressly preempts such a state law. Accordingly, we reverse the judgment of the Ninth Circuit, and remand this case for further proceedings consistent with this opinion.

*It is so ordered.*

———————

[10] We finally reject California's argument, see Brief for State Respondents 20, that our reading of the FMIA's preemption provision renders its saving clause insignificant. That clause provides that States may regulate slaughterhouses as to "other matters," not addressed in the express preemption clause, as long as those laws are "consistent with" the FMIA. 21 U. S. C. §678. So, for example, the Government acknowledges that state laws of general application (workplace safety regulations, building codes, etc.) will usually apply to slaughterhouses. See Tr. of Oral Arg. 22. Moreover, because the FMIA's express preemption provision prevents States from imposing only "addition[al]" or "different" requirements, §678, States may exact civil or criminal penalties for animal cruelty or other conduct that also violates the FMIA. See §678; cf. *Bates* v. *Dow Agrosciences, LLC*, 544 U. S. 431, 447 (2005) (holding that a preemption clause barring state laws "in addition to or different" from a federal Act does not interfere with an "equivalent" state provision). Although the FMIA preempts much state law involving slaughterhouses, it thus leaves some room for the States to regulate.