# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**PHILIP A. WHISTLER**
**ADAM ARCENEAUX**
**BRIAN J. PAUL**
Ice Miller LLP
Indianapolis, Indiana

**SCOTT P. SULLIVAN**
Flynn & Sullivan, P.C.
Indianapolis, Indiana

ATTORNEY FOR *AMICUS CURIAE*:

**MIRIAM E. ROBESON**
Flora, Indiana

ATTORNEYS FOR APPELLEE:

**GARY P. PRICE**
**JOSEPH P. ROMPALA**
Lewis & Kappes, P.C.
Indianapolis, Indiana

**CAROL SPARKS DRAKE**
Lewis & Kappes, P.C.
Zionsville, Indiana



FILED

Jun 07 2012, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

TDM FARMS, INC. OF NORTH CAROLINA )
and DALE JOHNSON, )
                                  )
        Appellants-Defendants,    )
                                  )
              vs.                 )      No. 79A02-1101-PL-33
                                  )
WILHOITE FAMILY FARM, LLC,        )
                                  )
        Appellee-Plaintiff.       )

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas H. Busch, Judge
Cause No. 79D02-0908-PL-39

**June 7, 2012**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

TDM Farms, Inc. of North Carolina and Dale Johnson (collectively, "TDM")[1] bring this interlocutory appeal from the trial court's denial of their motion for summary judgment against Wilhoite Family Farm, LLC ("Wilhoite"). Wilhoite had filed suit against TDM alleging nuisance, negligence, and trespass after TDM intentionally introduced a highly contagious virus—the Porcine Reproductive and Respiratory Syndrome ("PRRS")—to its hog farm, which then spread to Wilhoite's neighboring hog farm and caused significant loss. On appeal, TDM contends that summary judgment is appropriate because Wilhoite's claims are either preempted by the federal Virus-Serum Toxin Act ("the VSTA"), 21 U.S.C. §§ 151-159, or they are barred by Indiana's Right to Farm Act, Ind. Code § 32-30-6-9.

We hold that Wilhoite's claims are outside the scope of the VSTA and corresponding federal regulations. We also hold that the Right to Farm Act does not apply on these facts. Thus, we affirm the trial court's denial of summary judgment.

**FACTS AND PROCEDURAL HISTORY**[2]

TDM is a North Carolina-based commercial hog farming operation. Its primary breeding facilities and sow herds are in North Carolina. But once a pig is weaned from its mother, TDM ships the pig to a "finishing farm" where the pig is grown to market weight. TDM currently has about forty finishing farm contracts in Indiana, which, before

---

[1] Although Dale Johnson has separately filed a brief, in it he "adopts by reference the brief of appellant TDM." Johnson Br. at 1. Johnson adds no other arguments or facts, and he has not filed a separate appendix.

[2] We held oral argument on April 23, 2012.

2008, included a contract with Dale Johnson for use of his farm in Tippecanoe County ("the Johnson farm").

In January of 2008, one of TDM's North Carolina farms ("TDM #5") broke out with PRRS. PRRS is a highly contagious porcine virus believed to have hundreds, if not thousands, of different genetic strains. The virus can be spread in a number of ways: by contact with an infected pig; in utero from an infected mother to her fetus; or by contact with an area, such as a barn, shipping truck, or farmer, that was recently contacted by an infected pig. It is believed that insects and birds are capable of spreading the virus and, while "difficult to document," a leading theory suggests that PRRS is an airborne virus. See Appellant's App. at 515-16. Once a herd is infected, the virus tends to remain for an extended period of time. Along with respiratory symptoms, a pregnant sow infected with PRRS can have a spontaneous abortion, a still birth, weak piglets, and decreased future reproductivity. This, of course, results in serious financial harm to farmers.

There is no consensus among veterinarians on how to control, treat, and eradicate PRRS. One recognized method is to establish a "gilt acclimation facility" in which immature female swine (gilts) are segregated from the herd, immunized against a particular PRRS strain via inoculation, and then grown to market weight. See id. at 529-30. Once mature and immunized, the sows are reunited with the herd at a breeding facility, and piglets born to those immunized sows inherit the immunization.

In response to the outbreak at TDM #5, TDM renegotiated its contract with Dale Johnson to use the Johnson farm as a gilt acclimation facility. TDM chose the Johnson farm based on numerous favorable circumstances, including the farm's design and size,

but also because of its proximity to other breeding stocks owned by TDM and its proximity to feed mills and other finishing farms. TDM prepared a serum based on the PRRS strain at TDM #5, shipped gilts from Illinois to the Johnson farm, and inoculated the gilts. The gilts then became immunized to that strain of PRRS and were eventually shipped to the breeding farms in North Carolina.

In July of 2009, Wilhoite's farm broke out with a strain of PRRS that is more than 99% genetically identical to TDM's strain. Wilhoite's farm is about three-quarters of a mile from the Johnson farm, and Wilhoite was never notified by TDM that it had introduced the highly contagious virus to the Johnson farm. As a result of the PRRS outbreak, Wilhoite suffered an estimated loss of $275,000.

On August 11, 2009, Wilhoite filed suit against TDM alleging nuisance, negligence, and trespass. In relevant part, Wilhoite's complaint alleged as follows:

> 6. . . . [W]hen a herd contracts PRRS "biosecurity" measures must be undertaken, and, in the worst case, a herd can be lost and a facility shut down for decontamination and protection against further contagion.
>
> 7. It is the custom and practice in the hog industry, for both operators and their veterinary consultants, to alert neighboring or potentially affected operations of the outbreak of PRRS . . . . Prompt notice and containment procedures minimize loss from PRRS or its spread.

* * *

### Count I

### *Nuisance*

* * *

> 15. The conduct of the hog farming operations of TDM at [the Johnson farm] constitutes a nuisance, as defined by Indiana law.

4

* * *

*Count II*

<u>*Negligence*</u>

* * *

19.     TDM had and has a duty to conduct it[s] use and control of the property [the Johnson farm] in a reasonably safe and responsible fashion, as would similarly situated individuals, and in accord with accepted custom and practice of the relevant agricultural community.

20.     TDM breached that duty owed to Wilhoite.

* * *

*Count III*

<u>*Trespass*</u>

* * *

24.     Through its reckless or negligent conduct TDM has caused a dangerous pathogen to enter the property of Wilhoite.

25.     This trespass has caused economic and other losses to Wilhoite which are continuing . . . .

Id. at 21-24.

At his ensuing deposition, Alan Wilhoite, the owner of Wilhoite, testified that the purpose for his lawsuit was "[t]o ensure that [TDM] no longer continue[s] . . . this blood serum vaccine from North Carolina, and to help ensure that I have a relatively reasonable chance that I won't be reinfected with the PRRS virus." Id. at 225. Likewise, Wilhoite's veterinary expert, Dr. Jeffrey Harker, testified that "[t]he only unreasonable conduct I see is that . . . the virus was brought in a vial and not on a pig." Id. at 279. Wilhoite's second veterinary expert, Dr. John Baker, agreed that the "[d]eliberate infection of animals at an

5

otherwise healthy site with blood serum known to be carrying the PRRS virus poses a substantial and unnecessary risk that the infections will spread to other sites." Id. at 262.

Dr. Baker further testified, however, that there were real differences between inoculation through a serum and simply allowing an infected pig to roam through an unexposed herd:

> What you are doing [with serum inoculation] is getting all of the pigs infected at the same time. That doesn't typically happen in a PRRS herd. And so it poses a larger risk than a positive PRRS finisher. A positive PRRS finisher is one that has pigs becoming positive to the PRRS virus over a staggered period of time, maybe a few weeks, maybe a month or two.
>
> But with serum inoculation, on one day you give the animal live virus and everybody gets viremic at 7, 14 days, so there's a lot of virus. But again the real risk was that in normal production, [each pig] has equal risk to get PRRS. It's always out there, it could happen. That's sort of not really what's happening when you initially introduce a virus to a herd and then, rather than try to control it, you intentionally try to keep the virus burning. That's a different situation.

Id. at 253.

Dr. Harker opined that "the Johnson farm is the source of the PRRS contagion" at Wilhoite's farm based on the genetic similarity of the viruses. Id. at 435-36. Dr. Harker also opined that a third party did not cause Wilhoite's outbreak because the genetic "RFLP patterns" between TDM's virus and other nearby strains of the PRRS virus were different, while the pattern between TDM's virus and the virus at Wilhoite's farm was substantially identical. Id. at 436-37.

In September of 2010, TDM moved for summary judgment, which Wilhoite opposed. In its motion TDM asserted that Wilhoite's claims were either preempted by the VSTA or barred by Indiana's Right to Farm Act. On October 27, the trial court

6

entered its order denying TDM's motion.  In relevant part, the court concluded as follows:

> [Wilhoite's] claims are not preempted by VSTA.  To the extent the case is about the injection of animals with a serum, the case pertains to "the distribution and use of such products" and is "based on local disease conditions."  It therefore falls within the category of activities which the State may restrict.  <u>However, the case is not really about the serum at all.  It is about starting an infection of a disease in an area free from that particular strain of the disease and then maintaining a herd of infected animals in that area.</u> . . .

> * * *

> [Regarding the Right to Farm Act, b]oth the Johnson and Wilhoite sites have been operated as hog farms for many years, so both [locations] are continuing agricultural operations. . . .  Neither one has a superior right to farm under [the Act].  Additionally, nuisances which result from the negligent operation of an agricultural operation are not protected by [the Act].  Here, there is evidence of negligent operation which would, if found to be true, take the case out of the protection of the [Act].

Id. at 15, 18 (emphasis added; citation omitted).  The trial court certified its order for interlocutory appeal, which we accepted.[3]

## DISCUSSION AND DECISION

### Standard of Review

TDM appeals the trial court's denial of its motion for summary judgment.  Our standard of review for summary judgment appeals is well established:

> When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court.  Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment a matter of law."  In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against

---

[3] Amicus Carroll County Agriculture Association has filed a brief in support of TDM.

the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

Dreaded, Inc. v. St. Paul Guardian Ins. Co., 904 N.E.2d 1267, 1269-70 (Ind. 2009) (citations omitted). The party appealing a summary judgment decision has the burden of persuading this court that the grant or denial of summary judgment was erroneous. Knoebel v. Clark County Superior Court No. 1, 901 N.E.2d 529, 531-32 (Ind. Ct. App. 2009). Where the facts are undisputed and the issue presented is a pure question of law, we review the matter de novo. Crum v. City of Terre Haute ex rel. Dep't of Redev., 812 N.E.2d 164, 166 (Ind. Ct. App. 2004).

**Issue One: Federal Preemption**

Overview

TDM first contends that Wilhoite's claims are preempted by the VSTA. As this court recently stated:

> Because federal law is the supreme law of the land under the Supremacy Clause of the United States Constitution, state laws that interfere with or are contrary to federal law are invalidated under the preemption doctrine. A cardinal rule of preemption analysis is the starting presumption that Congress did not intend to supplant state law. This presumption against preemption takes on added significance where federal law is claimed to bar state action in fields of traditional state regulation. Accordingly the historic police powers of the States are not to be superseded by a Federal Act unless that was the clear and manifest purpose of Congress.
>
> There are three variations of the federal preemption doctrine: (1) express preemption, which occurs when a federal statute expressly defines the scope of its preemptive effect; (2) field preemption, which occurs when a pervasive scheme of federal regulations makes it reasonable to infer that Congress intended exclusive federal regulation of the area; and (3) conflict

8

preemption, which occurs when it is either impossible to comply with both federal and state or local law, or where state law stands as an obstacle to the accomplishment and execution of federal purposes and objectives.

The question, at bottom, is one of statutory intent, and we accordingly begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose. Determining statutory intent is a question of law we review de novo.

In re Beck's Superior Hybrids, Inc., 940 N.E.2d 352, 356-57 (Ind. Ct. App. 2011)

(citations, quotations, and alterations omitted).

The VSTA states:

It shall be unlawful for any person, firm, or corporation to prepare, sell, barter, or exchange in . . . the United States, any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product . . . intended for use in the treatment of domestic animals, unless and until the said virus, serum, toxin, or analogous product shall have been prepared, under and in compliance with regulations prescribed by the Secretary of Agriculture, at an establishment holding an unsuspended and unrevoked license issued by the Secretary of Agriculture as hereinafter authorized.

21 U.S.C. § 151. The VSTA confers on the Secretary of Agriculture, as the head of the

United States Department of Agriculture ("USDA"), authority

to make and promulgate from time to time such rules and regulations as may be necessary to prevent the preparation, sale, barter, exchange, or shipment as aforesaid of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product for use in the treatment of domestic animals, or otherwise to carry out this chapter . . . .

21 U.S.C. § 154. The USDA, in turn, has delegated its authority under the VSTA to the

Animal and Plant Health Inspection Service ("APHIS"). 9 C.F.R. § 101.2. And APHIS

has declared that

States are not free to impose requirements which are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product. Similarly, labeling requirements which are

9

different from or in addition to those in the regulations under the Act may not be imposed by the States. Such additional or different requirements would thwart the Congressional intent regarding uniform national standards, and would usurp USDA's authority to determine which biologics are pure, safe, potent, and efficacious. However, it has been APHIS' consistent position that individual States may impose certain restrictions on the distribution and use of biological products licensed by the USDA based on local disease conditions when such restrictions are made on a product-by-product basis. For example, a State is permitted to restrict distribution of a biological product where a particular disease does not exist in the State and where use of the biological product would make it difficult to distinguish between exposed and vaccinated animals.

\* \* \*

. . . This rule does not preempt any State or local laws, regulations, or policies, where they are necessary to address local disease conditions or eradication programs. However, where safety, efficacy, purity, and potency of biological products are concerned, it is the agency's intent to occupy the field. . . .

57 Fed. Reg. 38758, 38759 (Aug. 27, 1992) (emphases added).[4]

Thus, we are concerned here with field preemption, and APHIS has defined the scope of its field as "where [the] safety, efficacy, purity, and potency of biological products are concerned." Id. The Seventh Circuit Court of Appeals has further considered the "scope of APHIS' preemption statement" with respect to a common law claim that the manufacturer of an animal vaccine had committed a state tort when its vaccines failed to be effective. Lynnbrook Farms v. Smithkline Beecham Corp., 79 F.3d 620, 623 (1996). The Seventh Circuit held: "all other courts that have addressed the issue, including the district court below, have reached a conclusion similar to that which we reach today, i.e., that state common law claims of the type asserted in this case are preempted by the APHIS regulation." Id. (citing Lynnbrook Farms v. Smithkline

---

[4] It is not disputed that a party may file suit to enforce the VSTA's provisions, but Wilhoite does not suggest that such enforcement is the basis of its action against TDM.

Beecham Corp., 887 F. Supp. 1100 (C.D. Ill. 1995); Murphy v. Smithkline Beecham Corp., 898 F. Supp. 811 (D. Kan. 1995); Brandt v. The Marshall Animal Clinic, 540 N.W.2d 870 (Minn. Ct. App. 1995)).

In reaching that conclusion, the Seventh Circuit compared the preemption language used by APHIS with preemption language in federal statutes that the Supreme Court had held to preempt state common law actions. Specifically, the Seventh Circuit stated:

> APHIS chose language that mirrors preemption language in federal statutes that has been held by the Supreme Court, this court, and many other courts, to preempt both state regulations and common law damages actions. In Cipollone v. Liggett Group, 505 U.S. 504 (1992), the Supreme Court interpreted the preemption provision in the Public Health Cigarette Smoking Act of 1969, which amended the earlier Federal Cigarette Labeling and Advertising Act of 1965. The 1969 provision provided:
>
> > No requirement or prohibition based on smoking and health shall be imposed under state law with respect to the advertising and promotion of any cigarettes the packages of which are labeled in conformity with the provision of this Act.
>
> Id. at 515. The petitioners in Cipollone made the same argument that Lynnbrook advances here, maintaining that the provision was not intended to preempt state common law causes of action. The Court disagreed, finding "such an analysis [ ] at odds with the plain words of the 1969 Act and with the general understanding of common law damages actions." Id. at 521. The Court continued: "The phrase 'no requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules." The Court thus rejected the petitioner's argument and held that the provision preempted common law actions. Id. at 523-24. The Court warned, however, that the clause should not be taken as a blanket preemption of all common law claims. Id. The Court continued its analysis to determine which claims fell under the specific language of the clause. Id.

11

Following the Supreme Court's lead, we and other circuit courts (as well as many district courts) have held that language similar to that in Cipollone, and substantially the same as the APHIS preemption provision, encompasses common law actions. For instance, in Shaw v. Dow Brands, Inc., 994 F.2d 364 (7th Cir.1993), we were called upon to determine the scope of the preemption language in the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136v(b). The act stated that "[s]uch State shall not impose . . . any requirements for labeling or packaging in addition to or different from those required under this subchapter." Id. at 370. With Cipollone as our touchstone, we found that the Cipollone language of "[n]o requirements or prohibitions" was "just another way of saying a [s]tate shall not impose . . . any requirements," and we therefore held that plaintiff's strict liability and negligence failure to warn claims were preempted by FIFRA. Id. at 371. Six other circuits have reached similar conclusions. More recently, we have held that language in the Medical Device Amendments ("MDA") to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 360k(a), proscribing "any requirement . . . different from, or in addition to," those established pursuant to the MDA extended to preempt certain common law actions. Many circuits agree. Lynnbrook has not distinguished the language used by APHIS in any meaningful way from the language used in FIFRA or the MDA. In the face of this strong and consistent authority, we are compelled to reach the same conclusion we reached in Shaw. If common law actions cannot survive under the 1969 cigarette law, FIFRA or the MDA, then common law actions imposing additional requirements on animal vaccines cannot survive the reach of the APHIS provision. See Shaw, 994 F.2d at 371.

* * *

. . . Thus, if [the plaintiff's] claims relate to these qualities [of safety, purity, potency, or efficacy], seeking to impose additional or different requirements in these areas, they are preempted.

Id. at 627-30 (emphasis, alterations, and ellipses original; footnotes and some citations omitted).

The Seventh Circuit's analysis in Lynbrook Farms was ultimately derived from the Supreme Court's analysis in Cipollone. In that case, a plurality of the Court held that the statutory language " '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law." Cipollone, 505 U.S. at 521

12

(quoting 15 U.S.C. § 1334(b)); see also Nat'l Meat Ass'n v. Harris, 132 S. Ct. 965, 970 (2012) (holding that "[t]he [Federal Meat Inspection Act's] preemption clause sweeps widely . . . . The clause prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act . . . .") (discussing 21 U.S.C. § 678). But the Cipollone Court then clarified that common law actions were not necessarily preempted. Rather, in such actions "[t]he central inquiry in each case is straightforward: we ask whether the legal duty that is the predicate of the common-law damages action constitutes" a requirement or prohibition, even if non-conflicting, under the federal statute in question. Cipollone, 505 U.S. at 523-24. That is, where the common law action is a tort based on the failure to fulfill an underlying duty, we must consider whether the duty that would be imposed by a judgment for the plaintiff against the alleged tortfeasor would be a state-imposed obligation in conflict with the scope of the federal authority.

Accordingly, following Cipollone and Lynbrook Farms, we proceed by considering whether each of Wilhoite's three claims invade APHIS' authority over the safety, efficacy, purity, or potency of TDM's serum. In general, TDM asserts that each of the three claims "concern and relate to the serum TDM used to inoculate its pigs." Appellant's Br. at 19. Wilhoite, on the other hand, contends that each of its claims merely has "an incidental connection to [the] blood serum." Appellee's Br. at 13. Instead of concerning or relating to TDM's serum, Wilhoite continues, each of its claims amounts only to a restriction on the distribution and use of the serum based on local disease conditions. We agree with Wilhoite that each of its three claims survives.

13

<u>Nuisance and Negligence</u>

We first consider Wilhoite's nuisance and negligence claims. Wilhoite alleges that the "conduct of the hog farming operations of TDM" at the Johnson farm "constitutes a nuisance, as defined by Indiana law." Appellant's App. at 22. Indiana law defines a nuisance as "[w]hatever is: (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property . . . ." I.C. § 32-30-6-6. On the designated facts, it is clear that Wilhoite's claim is that TDM's "conduct of the hog farming operations" at the Johnson farm was "an obstruction to the free use" of Wilhoite's property so as to essentially interfere with Wilhoite's comfortable enjoyment of its property. <u>See</u> <u>id.</u>; Appellant's App. at 22.

Likewise, Wilhoite alleges that "TDM had and has a duty to conduct it[s] use and control of the [Johnson farm] in a reasonably safe and reasonable fashion, as would similarly situated individuals, and in accord with accepted custom and practice of the relevant agricultural community." Appellant's App. at 23. "To prevail on a claim of negligence a plaintiff is required to prove: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach." <u>Humphery v. Duke Energy Ind., Inc.</u>, 916 N.E.2d 287, 290-91 (Ind. Ct. App. 2009).

In relevant part, Wilhoite alleges that TDM acted negligently when it breached the following duties TDM owed to Wilhoite:

6.	[W]hen a herd contracts PRRS "biosecurity" measures must be undertaken, and, in the worst case, a herd can be lost and a facility shut down for decontamination and protection against further contagion.

7.	It is the custom and practice in the hog industry, for both operators and their veterinary consultants, to alert neighboring or potentially affected operations of the outbreak of PRRS . . . . Prompt notice and containment procedures minimize loss from PRRS or its spread.

Appellant's App. at 21.[5]	The designated evidence supports Wilhoite's allegations regarding TDM's lack of notice, precautionary measures, and containment of the virus.

Neither Wilhoite's nuisance claim nor its negligence claim "concern[]" or "relate[] to" the safety, efficacy, potency, or purity of TDM's serum. See 57 Fed. Reg. at 38759; Lynbrook Farms, 79 F.3d at 630. Rather, Wilhoite's nuisance claim is focused exclusively on the general manner in which TDM conducted its operations at the Johnson farm vis-à-vis Wilhoite's farm, and Wilhoite's negligence claim is based solely on TDM's failure to take reasonable precautions at the Johnson farm in implementing its inoculation program. In other words, these two claims focus not on the serum itself but on TDM's misuse of its otherwise lawful serum.

---

[5] TDM avers that Wilhoite has failed to designate evidence to show a genuine issue of material fact as to whether TDM caused Wilhoite's damages. This is not so. Wilhoite's veterinary experts testified that the virus on Wilhoite's farm was more than 99% genetically identical to TDM's virus and that no other strain of the PRRS virus on nearby farms matched Wilhoite's. This is sufficient for Wilhoite to at least get to trial.

TDM also argues that the testimony of Wilhoite's experts is inadmissible because "there are no generally accepted or scientifically validated standards for determining how close is too close when it comes to establishing a gilt development site . . . ." Appellant's Br. at 33. But TDM does not cite to the record to show where it raised this objection to the trial court, and TDM may not raise an objection for the first time on appeal. Ind. Appellate Rule 46(A)(8)(a); Rudnick v. N. Ind. Commuter Transp. Dist., 892 N.E.2d 204, 207 (Ind. Ct. App. 2008), trans. denied. TDM's waiver notwithstanding, the connection of the virus on Wilhoite's farm to TDM's virus is mainly based on Wilhoite's DNA evidence, and TDM does not dispute that Wilhoite's experts based their DNA analyses on reliable scientific principles. See Ind. Evidence Rule 702(b). We also note that Wilhoite has submitted a scientific article on PRRS—again, without objection from TDM—in which the authors acknowledge the "apparent long-distance transmission" capabilities of PRRS. Appellant's App. at 515.

In the language of APHIS' regulations, these two claims are centered on the manner in which TDM's use of the biological product affected local disease conditions, namely, the conditions on Wilhoite's farm. For such claims "it has been APHIS' consistent position that individual States may impose certain restrictions on the distribution and use of biological products licensed by the USDA[6] based on local disease conditions when such restrictions are made on a product-by-product basis." 57 Fed. Reg. at 38759.

TDM asserts that this express exception to APHIS' jurisdiction only applies to "positive law enactments . . . and not ad hoc, case-specific tort judgments." Appellant's Br. at 23. We cannot agree. APHIS' own language says that the exception applies when "States . . . impose . . . restrictions . . . on a product-by-product basis." 57 Fed. Reg. at 38759. And the Cipollone Court expressly concluded that the plain meaning of "imposed under State law" was not limited to positive law. 505 U.S. at 522-23. TDM's assertion that the exception to APHIS' jurisdiction does not include any common law claims is contrary to the rationale of Cipollone and the express language of APHIS. See 57 Fed. Reg. at 38759; Cipollone, 505 U.S. at 523-24.

A judgment for Wilhoite on these two claims would not impose a duty within the scope of the VSTA or APHIS' regulations. Again, we must consider "whether the legal

---

[6] There is no dispute that TDM was exempt from APHIS' licensure requirements since it created the serum for its own use. See 21 U.S.C. § 154a. TDM contends that this exemption means that the "local disease exception" does not apply to it. Appellant's Br. at 23-26. We cannot agree. While the relevant regulation does refer to licensed products at one point, later the regulation clarifies that it "does not preempt any State or local laws, regulations, or policies, where they are necessary to address local disease or eradication programs" so long as the State rule does not concern the safety, efficacy, purity, or potency of the biological product. 57 Fed. Reg. at 38759 (emphasis added). And TDM's assertion here would lead to the dubious conclusion that unlicensed products are subject to greater federal regulation than licensed products. That conclusion is not supported with citations to authority.

duty that is the predicate of the common-law damages action" amounts to an "additional or different[,] even if non-conflicting," requirement within the scope of the VSTA and corresponding regulations. Harris, 132 S. Ct. at 970; Cipollone, 505 U.S. at 523-24. Here, a judgment for Wilhoite on either or both of these claims would mean only that TDM has no legal right to use the Johnson farm in a manner that interferes with the property rights of its neighbors—that is, TDM's use of the Johnson farm may not interfere with the peaceful use, possession, and quite enjoyment of Wilhoite's property— and that TDM take reasonable and customary precautions against an adverse off-site impact before implementing an inoculation program. Those responsibilities do not concern the safety, efficacy, potency, or purity of TDM's serum and, therefore, they survive TDM's preemption argument.

Much of TDM's arguments to the contrary are based on the testimonies of Alan Wilhoite and Wilhoite's veterinary experts, Drs. Harker and Baker. Although Alan Wilhoite and his two veterinarians expressed concern about the danger posed by TDM's virus, that concern was expressed relative to Wilhoite's property, not to the serum itself. Thus, we do not see how this testimony is helpful to TDM. Neither are we persuaded by TDM's assertions that it must comply with APHIS' requests, if any were to be issued, regarding the safety of the serum. Wilhoite's claims do not touch upon APHIS' authority, and so there is no redundant burden imposed on TDM here.

We also agree with Wilhoite that "TDM's [preemption] analysis overstates the scope of APHIS preemption." Appellee's Br. at 17 (capitalization removed). As Wilhoite states, "[t]he consistent refrain in preemption cases is that the lawsuit raises

17

claims either in the nature of a products liability action[], i.e., where the claim is predicated on the preparation of a defective product, or a mislabeling claim." Id.; see, e.g., Lynnbrook Farms, 79 F.3d at 623 (considering a common law claim that the manufacturer of an animal vaccine had committed a state tort when its vaccines failed to be effective). And during oral argument, both sides acknowledged that no court has ever held that claims analogous to Wilhoite's nuisance and negligence claims are within the scope of the VSTA or APHIS' regulations, even though the VSTA has existed in its current form since 1985 and was first enacted in 1913.

The parties do not dispute that, had TDM brought the virus to the Johnson farm on a pig rather than in a serum, Wilhoite's lawsuit would raise claims outside the federal government's jurisdiction. We recognize that TDM may have had good reason to choose to inoculate its herd through a serum rather than through happenstance, but we do not see how that choice is relevant to Wilhoite's claims. Again, Wilhoite's claims challenge TDM's interference with Wilhoite's property as well as TDM's failure to take reasonable and customary precautions against an adverse off-site impact before implementing the inoculation program. Those claims are independent of the medium through which TDM inoculated its herd.

We decline TDM's request to apply federal authority to territory otherwise customarily reserved to the States absent an explicit congressional mandate. To interpret federal law and regulations in the manner TDM requests would require this court to say, in effect, that no matter the facts and circumstances, there is no state law cause of action or remedy when one misuses an otherwise lawful serum, regardless of the harm that use

18

causes and the collateral damage that results. TDM requests an absolute bar on all state causes of action, which is an absurd conclusion unsupported by the law. The VSTA and APHIS' regulations do not preempt any and all state law claims, and Congress did not intend to preclude claims arising from the misuse of an otherwise lawful serum. See, e.g., 57 Fed. Reg. at 38759.

Trespass

We next address whether Wilhoite's claim that TDM trespassed onto Wilhoite's property is preempted. According to Wilhoite's complaint, TDM trespassed when, "[t]hrough its reckless or negligent conduct[,] TDM . . . caused a dangerous pathogen to enter the property of Wilhoite." Appellant's App. at 24. In Indiana, "[t]respass is defined as '[a]n unlawful interference with one's person, property, or rights . . . . Any unauthorized intrusion or invasion of private premises or land of another.' " Travelers Indem. Co. v. Summit Corp. of Am., 715 N.E.2d 926, 937 n.15 (Ind. Ct. App. 1999) (omission original) (quoting Black's Law Dictionary at 1502 (6th ed. 1990)).

The thrust of Wilhoite's trespass claim alleges an invasion onto its property by TDM's virus due to "[TDM's] reckless or negligent conduct." Appellant's App. at 24. This claim is not artfully drafted and appears to conflate negligence and trespass law. Insofar as Wilhoite's claim is based on TDM's reckless or negligent conduct, the claim is duplicitous of Wilhoite's nuisance and negligence claims, which are addressed above. Thus, for our purposes we read this claim to allege a trespass based only on the invasion of TDM's virus onto Wilhoite's property.

While the trespass claim states that TDM permitted a "dangerous pathogen" to enter onto Wilhoite's property, the claim is based on the invasion of the pathogen and not its virulence. See Travelers Indem. Co., 715 N.E.2d at 937 n.15; Appellant's App. at 24. Thus, the trespass claim does not concern the safety, efficacy, purity, or potency of TDM's serum, and it is a valid state law claim. Nonetheless, it would not be inappropriate for the trial court to give a limiting instruction to the jury that it may not consider the safety, efficacy, purity, or potency of TDM's serum but only whether the manner in which TDM used the serum unlawfully interfered with Wilhoite's rights to the peaceful use, possession, and quiet enjoyment of its property.

### Issue Two: Indiana's Right to Farm Act

In the alternative to its preemption argument, TDM contends that Wilhoite's claims are barred by Indiana's Right to Farm Act (hereinafter, "the Act"). The Act "was adopted by the General Assembly in an attempt to limit the circumstances under which agricultural operations could become subject to nuisance suits." Lindsey v. DeGroot, 898 N.E.2d 1251, 1257 (Ind. Ct. App. 2009). According to the Act:

> (a) This section does not apply if a nuisance results from the negligent operation of an agricultural or industrial operation or its appurtenances.

> (b) The general assembly declares that it is the policy of the state to conserve, protect, and encourage the development and improvement of its agricultural land for the production of food and other agricultural products. The general assembly finds that when nonagricultural land uses extend into agricultural areas, agricultural operations often become the subject of nuisance suits. As a result, agricultural operations are sometimes forced to cease operations, and many persons may be discouraged from making investments in farm improvements. It is the purpose of this section to reduce the loss to the state of its agricultural resources by limiting the

circumstances under which agricultural operations may be deemed to be a nuisance.

(c) For purposes of this section, the continuity of an agricultural or industrial operation shall be considered to have been interrupted when the operation has been discontinued for more than one (1) year.

(d) An agricultural or industrial operation or any of its appurtenances is not and does not become a nuisance, private or public, by any changed conditions in the vicinity of the locality after the agricultural or industrial operation, as the case may be, has been in operation continuously on the locality for more than one (1) year if the following conditions exist:

(1) There is no significant change in the type of operation. A significant change in the type of agricultural operation does not include the following:

(A) The conversion from one type of agricultural operation to another type of agricultural operation.

(B) A change in the ownership or size of the agricultural operation.

(C) The:

(i) enrollment; or
(ii) reduction or cessation of participation;

of the agricultural operation in a government program.

(D) Adoption of new technology by the agricultural operation.

(2) The operation would not have been a nuisance at the time the agricultural or industrial operation began on that locality.

I.C. § 32-30-6-9 (emphasis added).

In Wendt v. Kerkhof, 594 N.E.2d 795, 798 (Ind. Ct. App. 1992), trans. denied, this court reviewed the legislative intent underlying the Act. We stated as follows: "The doctrine of 'coming to the nuisance,' as codified in [the Act], applies when an

21

agricultural operation has been in existence for more than one year and then someone becomes an adjacent landowner and claims nuisance. In such cases, a nuisance action is precluded by statute." Id. (citations omitted). The statute's policy has also led this court to conclude that, "when examining the statutory provisions and the policy behind the Right to Farm Act, it is our view that it has no applicability to the manner in which two farmers . . . conduct their operations." Stickdorn v. Zook, 957 N.E.2d 1014, 1024 n.5 (Ind. Ct. App. 2011).

We agree with Wilhoite and the trial court that the Act does not apply in this action between two established farming operations. See id.; Wendt, 594 N.E.2d at 798. TDM's only response to this conclusion is to assert that the text of the Act does not support the case law, but we cannot agree. The Act, by its plain terms, was intended to prohibit nonagricultural land uses from being the basis of a nuisance suit against an established agricultural operation. I.C. § 32-30-6-9(b). Our case law has consistently applied the law according to the General Assembly's plainly stated intent, and we will not reconsider those conclusions for TDM's sake. We affirm the trial court's denial of TDM's motion for summary judgment on this issue.

## Conclusion

In sum, we hold that Wilhoite's three claims are directed only against TDM's alleged misuse of an otherwise lawful serum. As the trial court stated, those claims are "not really about the serum at all." Appellant's App. at 15. As such, those claims are outside the scope of the federal jurisdiction and are properly before the trial court. We

22

also hold that Indiana's Right to Farm Act does not apply on these facts between farming operations. Thus, we affirm the trial court's denial of summary judgment.

Affirmed.

VAIDIK, J., and BRADFORD, J., concur.