Matter of City of New York v Ball (2024 NY Slip Op 24179)

[*1]

Matter of City of New York v Ball

2024 NY Slip Op 24179

Decided on June 21, 2024

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on June 21, 2024
Supreme Court, Albany County

In the Matter of The City of New York, Petitioner, 
 For a Judgment Under Article 78 of the New York CPLR

against
Richard A. Ball, as Commissioner of Agriculture and Markets of the State of New York, and the NEW YORK STATE DEPARTMENT OF AGRICULTURE AND MARKETS, Respondents, 
 and LA BELLE FARM, INC. and HVFG, LLC d/b/a Hudson Valley Foie Gras, Intervenor-Respondents.

Index No. 900607-24

Sylvia O. Hinds-Radix, Corporation Counsel
Attorney for Petitioner
(Michelle Goldberg-Cahn, Aimee Lulich and Isabella Kendrick, of counsel)
100 Church Street, Room 5-170
New York, New York 10007
Letitia James, Attorney General
Attorney for State Respondents
(Matthew J. Gallagher, of counsel)
The Capitol
Albany, New York 12224
Keane & Beane, P.C.
Attorneys for Intervenor-Respondents
(Edward J. Phillips, of counsel)
445 Hamilton Avenue, 15th Floor
White Plains, New York 10601

Richard M. Platkin, J.

New York City Local Law No. 2019/202 (see Administrative Code of City of NY § 17-1901 et seq. ["Local Law 202"]) prohibits restaurants and retail food establishments within the City of New York from selling or serving foie gras and other force-fed products.
In this special proceeding brought pursuant to CPLR article 78, petitioner City of New York ("City") challenges the final determination of respondents Richard A. Ball, as Commissioner of Agriculture and Markets ("Commissioner"), and the Department of Agriculture and Markets ("Department") (collectively, "State Respondents"), which found that Local Law 202 unreasonably restricts and regulates farming operations within the agricultural districts where foie gras is produced, in contravention of Agriculture and Markets Law ("AML") § 305-a.
The State Respondents oppose the petition (see NYSCEF Doc No. 1 ["Petition"]) through an answer (see NYSCEF Doc Nos. 34-51). The Petition also is opposed by intervenor-respondents La Belle Farm, Inc. and HVFG, LLC d/b/a Hudson Valley Foie Gras (collectively, "Farms"), the Sullivan County producers of foie gras who initiated the administrative review process giving rise to the challenged final determination (see NYSCEF Doc Nos. 35, 37).
BACKGROUND
A. Local Law 202
The City adopted Local Law 202 on November 25, 2019 (see Petition, ¶ 9; NYSCEF Doc No. 2 [text]).[FN1]

Under Local Law 202, "[n]o retail food establishment or food service establishment" in the City "shall store, keep, maintain, offer for sale, or sell any force-fed product or food containing a force-fed product" (Administrative Code of City of NY § 17-1902). "Force-feeding" is defined as "the practice of forcing, by any means, food or supplements into the throat, esophagus, crop or stomach of an animal" (id. § 17-1901), and a "force-fed product" is one produced by "force-feeding a bird . . . with the intent to fatten or enlarge [its] liver" (id.). 
The Petition explains that foie gras is produced by "inserting a foot-long metal or plastic pipe down the . . . esophagus" of a male goose or duck as young as 8 to 10 weeks (Petition, ¶ 15). "Two to four pounds of grain and fat are forced down the birds' esophagus at least two to [*2]three times per day" (id., ¶ 16). "The objective . . . is to produce a liver ten times the size of a non-force-fed bird" (id., ¶ 18). 
But force-feeding "often results in bruising, lesions, perforation of the esophagus, and can cause asphyxia or suffocation if the food enters the trachea instead of the esophagus" (id., ¶ 17). And force-fed birds often suffer from liver disease and "are twenty-times more likely to die than [birds] that are not force-fed" (id., ¶ 21).
The Petition also cites: polls showing that the overwhelming majority of City residents oppose force-feeding and support the sales ban (see id., ¶ 24); the unwillingness of many large retailers to sell foie gras (see id., ¶ 25); the laws of other nations and the State of California banning the sale of foie gras (see id., ¶¶ 26-27); and opinions of veterinarians and animal welfare advocates that "force feeding is inherently inhumane" (id., ¶ 28).
B. AML § 305-a
Article 25-AA of the Agriculture & Markets Law ("Article 25-AA") is "a locally-initiated mechanism for the protection and enhancement of New York state's agricultural land as a viable segment of the local and state economies and as an economic and environmental resource of major importance" (AML § 300). 
The Legislature enacted Article 25-AA in 1971 to implement the State's constitutional policy of "encourag[ing] the development and improvement of its agricultural lands for the production of food and other agricultural products" (NY Const, art XIV, § 4). "[T]he Legislature . . . found that 'many of the agricultural lands in New York state are in jeopardy of being lost for any agricultural purposes' due to local land use regulations inhibiting farming, as well as various other deleterious side effects resulting from the extension of nonagricultural development into farm areas" (Town of Lysander v Hafner, 96 NY2d 558, 563 [2001], quoting AML § 300). 
"When nonagricultural development extends into farm areas, competition for limited land resources results. Ordinances inhibiting farming tend to follow, farm taxes rise, and hopes for speculative gains discourage investments in farm improvements, often leading to the idling or conversion of potentially productive agricultural land" (AML § 300). "It is, therefore, the declared policy of the state to conserve, protect and encourage the development and improvement of its agricultural land for production of food and other agricultural products . . . [and] to conserve and protect agricultural lands as valued natural and ecological resources" (id.). 
Under Article 25-AA, a county legislature may establish "an agricultural district within [the] county" (AML § 303 [1]). Once created and approved by the Commissioner, the land and farm operations within the agricultural district are entitled to certain benefits and protections (see Lysander, 96 NY2d at 563).
The Farms produce foie gras in two agricultural districts within Sullivan County (see Petition, ¶ 41). There are no agricultural districts in the City (see id., ¶ 44). Statewide, there are 152 agricultural districts spanning 50 counties, comprising about 25% of the State's total land area (see NYSCEF Doc No. 50 ["Tylutki Aff."], ¶ 4). 
At issue herein is AML § 305-a, which limits the powers of local governments "to enact and administer comprehensive plans and local laws, ordinances, rules or regulations" (AML § 305-a [1] [a]). The statute obliges local governments to exercise their local lawmaking "powers in such manner as may realize the policy and goals set forth in [Article 25-AA], and [to] not unreasonably restrict or regulate farm operations within agricultural districts in contravention of the purposes of [Article 25-AA] unless it can be shown that the public health or safety is threatened" (id.). 
For purposes of AML § 305-a, "farm operations" is defined as "the land and on-farm buildings, equipment, manure processing and handling facilities, and practices which contribute to the production, preparation and marketing of crops, livestock and livestock products as a commercial enterprise" (AML § 301 [11]).
"Upon the request of any municipality, farm owner or operator . . . , the commissioner shall render an opinion . . . as to whether farm operations would be unreasonably restricted or regulated by proposed changes in local land use regulations, ordinances or local laws pertaining to agricultural practices" (id. § 305-a [1] [b]).
C. Proceedings Before the State Respondents
The Farms requested review of Local Law 202 under AML § 305-a (1) (b), claiming that "it was the express intention of the [City] to restrict [the Farms' agricultural] practices" through the use of its power as "the largest market for the [Farms'] foie gras products" (NYSCEF Doc No. 35, Attachment 4 at 1-2; see Petition, ¶ 45).
1. Interim Determination
By letter dated August 4, 2020, the Department advised the City of its initial determination that Local Law 202 "appeared to violate 'State agricultural policy and the provisions of AML Article 25-AA'" (Petition, ¶ 46, quoting NYSCEF Doc No. 3 ["Interim Determination"]). The Department found that the provisions of Local Law 202 "banning the sale or provision of certain 'force-fed' poultry products . . . violate[] the policy and goals of [Article 25-AA] and unreasonably restrict[] . . . farm operations" located within agricultural districts, "in possible violation of AML § 305-a (1) (a)" (Interim Determination at 6). 
After determining that a City ban on the retail sale of foie gras would "threaten the viability of [the Farms]" (id. at 5), the Department turned to the legislative history of Local Law 202, which "reveals that the City Council both recognized the economic impact of the prohibition of sales on the [Farms] and its use as a tool either to end or change the on-farm feeding practice to which the City objects" (id.). 
Relying on a quote from the legislative sponsor, who "described as [Local Law 202's] objective the end of the feeding method used in [foie gras] production because it is 'clearly an inhumane practice'" (id. [citation omitted]), the Department determined that "the City's law was adopted as an animal 'welfare' measure . . . to end or discourage an animal husbandry practice which the City legislators view as 'inhumane.' Nothing in the legislative record indicates that [Local Law 202] was intended to address a public health or safety concern" (id. at 6).
The City was invited to respond to the Interim Determination, particularly with any "further documentation and other evidence" showing that the sale of force-fed products posed a threat to the health or safety of City residents (id.).
In an eight-page response, the City insisted that Local Law 202 does not fall within the scope of AML § 305-a, a statute "intended to protect agricultural districts from laws, ordinances, or regulations that impact farm operations by the local governments with jurisdiction over the areas in which the farms are located" (Petition, ¶ 51; see also NYSCEF Doc No. 4 ["City Response" or "Response"]). The City argued that Local Law 202 does not "have a direct impact" on farm operations in Sullivan County and observed that "[t]he law resulted from a policy decision" concerning "a cruel and inhumane" practice being used "for the sole purpose of providing a culinary delicacy for human consumption" (City Response at 1-2). The City also claimed that the Commissioner's expansive reading of AML § 305-a impinged on its broad home-rule powers (see id. at 7-8).
[*3]2. The First Final Determination
On December 14, 2022, the Commissioner issued a final determination and order, declaring that Local Law 202 violates AML § 305-a (1) and the policy and goals of Article 25-AA (see NYSCEF Doc No. 5 ["First Final Determination"]). 
The City challenged the First Final Determination in a proceeding brought under CPLR article 78 (see Index No. 900460-23 ["City v Ball I"], NYSCEF Doc Nos. 1-11). In addition to legal arguments concerning the jurisdiction of the Department under AML § 305-a, the City challenged the First Final Determination as arbitrary and capricious on various grounds, including the Department's failure to adequately consider the legislative history of Local Law 202 (see City v Ball I, NYSCEF Doc No. 1, ¶¶ 88-92).
In a Decision & Order dated August 3, 2023 ("Prior Decision"), this Court annulled the First Final Determination as arbitrary and capricious and remitted the matter to the State Respondents for redetermination (80 Misc 3d 1077 [Sup Ct, Albany County 2023]). 
As detailed in the Prior Decision, the State Respondents relied on a "review of Local Law 202 and its legislative history" in finding that the City's purpose "is to induce [the Farms] to adopt feeding practices that the City deems acceptable, or to force them out of business" (First Final Determination at 2-3). The State Respondents also relied on the legislative history in finding that Local Law 202 was not adopted to address a threat to health or safety (see id. at 2-4). 

"Notwithstanding the foregoing, the State Respondents disclosed at oral argument that they had not reviewed the legislative history of Local Law 202, beyond the two brief quotations in the Interim Determination, which are partially reiterated in the [First Final Determination]" (80 Misc 3d at 1089). "[H]aving exercised their discretion to consider the legislative history of Local Law 202 in applying [AML] § 305-a, the State Respondents were obliged to conduct a meaningful review of that history" (id. at 1090). "The [First Final Determination] is arbitrary and capricious because its findings are based on a review of legislative history confined to two brief quotes culled from a [multi-thousand page] legislative record" (id.).
3. The Second "Final Determination"
With the benefit of a comprehensive review of the history of Local Law 202, the Commissioner issued a final determination and order on December 11, 2023, again barring the City from implementing Local Law 202 under AML § 305-a (see Petition, ¶¶ 59-60; NYSCEF Doc No. 6 ["Final Determination"]). 
At the outset, the Commissioner observed that the City had not challenged "various findings of fact or law" from the Interim Determination that were "based upon the submissions of the Farms and the results of [the Department's] investigation and its analysis of Local Law 202 and State law" (Final Determination at 4). Among these unchallenged findings were: (i) the Farms are farm operations within agricultural districts; (ii) force-feeding ducks to produce foie gras is "a customary agricultural practice"; (iii) there are "no commercially viable alternatives to [force-feeding] to produce foie gras"; (iv) no State or federal law prohibits the use of force-feeding or the sale of force-fed products; and (v) Local Law 202 "would result in a significant loss of sales for the Farms . . . [and] threaten the viability of [the Farms,] as the continued use of [force-feeding] would restrict their access to one of their major markets, discourage investment in their farm properties, and threaten their continued operation in the agricultural districts where they operate" (id. at 4-5).
"[U]pon a preliminary finding of unreasonableness, the focus . . . shifts to any threat to [*4]public health or safety, as such a showing could support the local law" (id. at 5). "Although specifically invited to raise any claimed threats to public health or safety, . . . the City . . . made no claim (and neither submitted nor identified any information indicating) that Local Law 202 addressed any public health or safety threat" (id.). "In fact, the City confirmed the Department's interim finding that the purpose of Local Law 202 was to address an animal welfare issue" by stating in its Response that the "law resulted from a policy decision" concerning the "cruel and inhumane treatment of birds that are force-fed for the sole purpose of providing a culinary delicacy for human consumption" (id. [internal quotation marks omitted]). 
The Commissioner further found that review of the "entire legislative history" of Local Law 202 supports its "characterization . . . as an animal welfare measure" (id. at 6). "In over 2,000 pages of statements and testimony relating to the 16-bill package of animal welfare proposals being considered, no City legislator identified any threat to human health or safety as being addressed by Local Law 202" (id.). "The vast bulk of the hearing testimony and submissions relating to Local Law 202 consisted of statements and letters making conclusory claims concerning [force-feeding]," and "[t]he law's principal sponsor discussed the bill as one protecting animals" (id.).
"In short, the Department's preliminary finding that Local Law 202 would constitute an unreasonable restriction on the Farms was not challenged by the City on the merits; the City conceded that Local Law 202 was an animal welfare measure; and the City neither claimed nor presented any evidence . . . that Local Law 202 addresses any public health or safety concern" (id.).
The Commissioner then rejected the City's jurisdictional objection, concluding that "AML 305-a (1), by its express terms, reaches unreasonable local restrictions on farm operations operating in agricultural districts without regard to where the local governments are located" (id. at 8). "[T]he limitations that the City reads into AML 305-a are nowhere found within the express terms of the statute" (id. at 9).
Finally, the Commissioner was unpersuaded by the City's argument that "all [it] has done is regulate the conduct of businesses within its jurisdiction" (id. at 11). "That the City lacks the power to directly regulate farm production methods beyond its jurisdiction, does not insulate its sales ban from the Department's Section 305-a power to review and supersede a local law that unreasonably restricts farm operations within agricultural districts from selling its products into the local government's market" (id.).
D. This Proceeding
The City commenced this CPLR article 78 proceeding on January 10, 2024 (see NYSCEF Doc Nos. 1-11), alleging three causes of action. First, the City alleges that the Final Determination is ultra vires because Local Law 202 does not "directly restrict or regulate farm operations within an agricultural district" (Petition, ¶ 78). Next, the City contends that the Final Determination was rendered in contravention of the Municipal Home Rule Law, which grants the City broad police powers (see id., ¶¶ 87-90). Finally, the City alleges that the Final Determination is arbitrary and capricious in certain limited respects (see id., ¶¶ 98-101).
On March 25, 2024, the Court granted the Farms' unopposed application to intervene in opposition to the Petition (see NYSCEF Doc No. 28). The City noticed the Petition for hearing [*5]on May 3, 2024 (see NYSCEF Doc Nos. 27), the parties completed briefing on May 1, 2024,[FN2]
and this Decision, Order & Judgment follows.[FN3]

DISCUSSION
A. Standard of Review
In reviewing action taken by an agency without a hearing, the Court's role is limited to examination of whether the "determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]; see Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale and Mamaroneck, Westchester County, 34 NY2d 222, 231-232 [1974]). 
"An action is arbitrary and capricious when it is taken without sound basis in reason or regard to the facts" (Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009], citing Pell, 34 NY2d at 231). Under this deferential standard, a determination supported by a rational basis must be sustained, "even if the court concludes that it would have reached a different result than the one reached by the agency" (id.; see Matter of Heintz v Brown, 80 NY2d 998, 1001 [1992]). 
Similarly, "an agency's interpretation of the statutes it administers must be upheld absent demonstrated irrationality or unreasonableness" (Lorillard Tobacco Co. v Roth, 99 NY2d 316, 322 [2003] [internal quotation marks and citation omitted]). But a court "need not accord any deference" if the issue is one of "pure statutory interpretation" (Matter of Walsh v New York State Comptroller, 34 NY3d 520, 524 [2020] [internal quotation marks and citation omitted]). 
B. The Parties' Principal Contentions
The principal question presented by the Petition is whether the retail sales ban of Local 202 "restrict[s] or regulate[s] farm operations within agricultural districts" in Sullivan County where foie gras is produced, so as to give rise to jurisdiction under AML § 305-a.[FN4]

The City contends that Local Law 202 falls outside the scope of AML § 305-a because it [*6]does not directly restrict or regulate farm operations in agricultural districts. According to the City, Local Law 202 merely prohibits restaurants and food establishments within the City from selling force-fed products (see Administrative Code of City of NY § 17-1902), and the Farms remain free to continue producing foie gras in agricultural districts through force-feeding.
The State Respondents acknowledge that Local Law 202 does not prevent the Farms from continuing to produce foie gras by force-feeding ducks, but they argue that "[t]he plain language of AML § 305-a gives the Department broad discretion in determining whether a local law 'restricts or regulates farm operations,' regardless of whether said local law has a direct or indirect impact on farm operations" (NYSCEF Doc No. 51 ["State Opp"] at 17). 
The Farms similarly rely on the plain language of AML § 305-a, which is said to apply without qualification to all "local laws, ordinances, rules or regulations" adopted by local governments (see NYSCEF Doc No. 33 ["Farms Opp"] at 14-15 [internal quotation marks omitted]). Additionally, the Farms emphasize case law from the New York State Court of Appeals and the U.S. Supreme Court "consider[ing] the practical, indirect effects of legislation in various contexts," including preemption (id. at 22; see Final Determination at 11).
C. Principles of Statutory Construction
In interpreting a statute, the Court's "fundamental role . . . is to effect the intent of the legislature" (Alcantara v Annucci, ___ NY3d ___, 2024 NY Slip Op 02224, *2 [2024]). 
"As the clearest indicator of legislative intent is the statutory text, the starting point . . . must always be the language itself, giving effect to the plain meaning thereof" (People v Golo, 26 NY3d 358, 361 [2015] [internal quotation marks and citation omitted]). 
"The literal language of a statute is generally controlling unless the plain intent and purpose would otherwise be defeated, or where a literal construction would lead to absurd or unreasonable consequences that are contrary to the purpose of the statute's enactment" (People ex rel. E.S. v Superintendent, Livingston Corr. Facility, 40 NY3d 230, 235 [2023] [internal quotation marks, alterations and citation omitted]).
"[A]ll parts of a statute are intended to be given effect and a statutory construction which renders one part meaningless should be avoided" (Matter of Anonymous v Molik, 32 NY3d 30, 37 [2018] [internal quotation marks and citation omitted]). Thus, "[w]hen a statute is part of a broader legislative scheme, its language must be construed in context and in a manner that harmonizes the related provisions and renders them compatible" (James B. Nutter & Co. v County of Saratoga, 39 NY3d 350, 355 [2023] [internal quotation marks and citations omitted]). 
D. Analysis
Under AML § 305-a, the Commissioner has jurisdiction to review and supersede "local laws, ordinances, rules or regulations" that unreasonably "restrict or regulate farm operations within agricultural districts."
The City argues that the terms "restrict or regulate" refer only to local laws "that directly restrict or regulate operations on the farms and within the agricultural district" (NYSCEF Doc No. 10 ["MOL"] at 9-10 [emphasis added]). As respondents observe, however, the limitation that the City relies upon does not appear in the statutory text (see State Opp at 17; Farms Opp at 13). On its face, AML § 305-a (1) (a) broadly and unqualifiedly obliges local governments exercising their powers "to enact and administer comprehensive plans and local laws, ordinances, rules or regulations" to do so in a manner that does "not unreasonably restrict or regulate farm operations within agricultural districts" (see also AML § 300).
But that does not fully resolve the question of whether Local Law 202's sales ban "restrict[s] or regulate[s]" the operations of the Farms "within" agricultural districts. As observed by the City, Local Law 202 does not prevent the Farms from continuing to produce foie gras by force-feeding birds in agricultural districts; it only prevents City restaurants and retail food establishments from selling force-fed products or offering them for sale.
The terms "restrict" and "regulate" are not defined in AML § 305-a or elsewhere in Article 25-AA, but the literal language of the statute is sufficiently expansive to encompass a local sales ban that threatens the viability of farm operations within agricultural districts based on the production practices used within those agricultural districts. Construing the statutory terms in an ordinary and literal sense, Local Law 202 can be understood as an indirect "regulat[ion]" that operates to "restrict" the production of foie gras "within agricultural districts." In other words, the Farms' "operations," which includes "practices [that] contribute to the production, preparation and marketing of . . . livestock products as a commercial enterprise" (AML § 301 [11]), "would be unreasonably restricted or regulated" by the retail sales ban of Local Law 202 (id. § 305-a [1] [b]).
However, AML § 305-a (1) (a) uses the terms "restrict or regulate" in relation to the "powers" of local governments to adopt "comprehensive plans and local laws, ordinances, rules or regulations." In the context of local lawmaking (see NY Const, art IX, § 1; Municipal Home Rule Law § 10), "restrict" and "regulate" ordinarily are understood in a narrower sense, one implicating notions of territorial jurisdiction.
Local governments in New York State enjoy broad home-rule powers, but their powers generally are limited to the regulation of conduct occurring within their territorial boundaries (see City of Poughkeepsie v Vassar Coll., 35 Misc 2d 604, 606 [Sup Ct, Dutchess County 1961]; see also Bakalar v Lazar, 71 Misc 2d 683, 686 [Sup Ct, NY County 1972]). Thus, the Municipal Home Rule Law ("MHRL") authorizes a local government to regulate in relation to "its property, affairs or government" (MHRL § 10 [1] [i] [emphasis added]), as well as the "protection, order, conduct, safety, health and well-being of persons or property therein" (id. [1] [ii] [a] [12] [emphasis added]; see also id. [1] [ii] [a] [12] [a-b]; id. [2]).
The same is true of "comprehensive plans" (AML § 305-a [1] [a]), which are the official policies adopted by local governments to guide the use of their lands and govern the adoption of local land-use laws, such as zoning and planning laws (see generally Marx v Zoning Bd. of Appeals of Vil. of Mill Neck, 137 AD2d 333, 336 [2d Dept 1988]; New York Dept. of State, Zoning & the Comprehensive Plan at 1-2 and 9, available at https://dos.ny.gov/system/files/documents/2023/01/zoning-and-the-comprehensive-plan.pdf).
Inasmuch as local governments generally lack the "powers to enact and administer comprehensive plans and local laws, ordinances, rules or regulations" of extra-territorial character, it seems doubtful that the Legislature contemplated the terms "restrict or regulate" as referring to anything more than the governance of certain types of conduct (i.e., "farm operations") occurring "within" the boundaries of "agricultural districts" (AML § 305-a [1] [a]).
And as the City observes, there is nothing in the legislative history of AML § 305-a showing that the Legislature contemplated review of the effects of local laws governing conduct outside of agricultural districts (see Matter of Inter-Lakes Health, Inc. v Town of Ticonderoga Town Bd., 13 AD3d 846, 848 [3d Dept 2004]; see generally Riley v County of Broome, 95 NY2d 455, 463 [2000]). To the contrary, the history shows that the Legislature was focused on traditional forms of direct regulation that posed a threat to farming at the time (see Lysander, 96 [*7]NY2d at 563).
Consistent with that legislative history, all of the prior administrative and judicial decisions interpreting and applying AML § 305-a involved local laws governing conduct within agricultural districts (see generally https://agriculture.ny.gov/land-and-water/orders-issued-pursuant-305 [collecting authorities]). These decisions addressed a variety of on-farm issues, including: (i) worker housing (see Lysander, 96 NY2d at 564-565);[FN5]
(ii) waste disposal and nutrient-management practices (see Matter of Town of Butternuts v Davidsen, 259 AD2d 886, 887 [3d Dept 1999]; Matter of Town of Wheatfield v Ball, Sup Ct, Albany County, July 20, 2018, O'Connor, J., index No. 903925-17); (iii) composting (see Matter of Town of Verona v McGuire, Sup Ct, Albany County, Sep. 20, 1996, Teresi, J., index No. 1740-95); (iv) zoning and planning restrictions (see Inter-Lakes Health, 13 AD3d at 848; Town of Beekman v Giangrande, Sup Ct, Dutchess County, Mar. 28, 2003, Dillon, J., index No. 2377/02; Danielewicz v High, Sup Ct, Niagara County, July 13, 1994, Mintz, J., index No. 086188); (v) energy production (see Matter of Town of Clarence v Ball, Sup Ct, Albany County, Jan. 5, 2016, Melkonian, J., index No. 3102-15; K&W Enters. v Town of Gaines, Sup Ct, Orleans County, Dec. 11, 2015, Punch, J., index No. 13-41436); and (vi) access to public infrastructure (see Matter of Ball v Town of Ballston, 173 AD3d 1304, 1305 [3d Dept 2019], lv denied 34 NY3d 903 [2019]).
Respondents also invoke the 1997 amendments to AML § 305-a (see L 1997, ch 357), but they have not identified anything in the text or history of the amendments evincing the Legislature's intention to extend jurisdiction to the effects of local laws governing conduct outside of agricultural districts. If the Commissioner did not have jurisdiction over such laws prior to the 1997 amendments, the 1997 amendments did not confer that jurisdiction.
However, as properly observed by respondents, there is a good reason for the absence of any legislative history or precedent for the exercise of AML § 305-a jurisdiction over the effects of a local sales ban: There simply is no precedent for a local government, particularly the State's largest consumer market, to ban the sale of agricultural products produced in compliance with federal and State law based on objections to farm practices. "That this issue appears to be one of 'first impression' simply indicates that few, if any, local governments have had the desire and the market power to attempt to alter on-farm practices of farms beyond its jurisdiction" (Final Determination at 11-12).
Although the Legislature that adopted and amended AML § 305-a was unfamiliar with the concept of sales bans like Local Law 202,[FN6]
the Legislature was familiar with the "venerable prohibition on public officials doing indirectly what they are forbidden from doing directly" [*8](People v Grasso, 42 AD3d 126, 140 n 9 [1st Dept 2007], affd 11 NY3d 64 [2008]). The principle that State law cannot be circumvented through indirection is one that the New York courts have invoked in a wide variety of contexts over the years (see e.g. Matter of Diamond Asphalt Corp. v Sander, 92 NY2d 244, 259 [1998]; Caton v Doug Urban Constr. Co., 65 NY2d 909, 911 [1985]; Matter of Gabriela A., 103 AD3d 888, 889 [2d Dept 2013], affd 23 NY3d 155 [2014]; see also People ex rel. Burby v Howland, 155 NY 270, 280-281 [1898]). 
The Legislature that adopted and amended AML § 305-a also was familiar with the principle that preemption decisions must "not turn on semantics," and courts are obliged to look to the purpose and "direct consequences of a local ordinance" in determining whether it is preempted or superseded by State law (Matter of Lansdown Entertainment Corp. v New York City Dept. of Consumer Affairs, 74 NY2d 761, 764 [1989]).
The Department found in its Interim Determination that Local Law 202 "was adopted as an animal 'welfare' measure . . . to end or discourage an animal husbandry practice which the City legislators view as 'inhumane'" (Interim Determination at 6). The City's objective was "either to end or change the on-farm . . . practice" of force-feeding based on animal welfare concerns (id. at 5). And when given the opportunity to respond, the City did not dispute that Local Law 202 was adopted to address concerns about the "cruel and inhumane treatment of birds" (Response at 2).
Further, the Commissioner confirmed upon remittal that "the entire legislative history" supported the Department's earlier "characterization of Local Law 202 as an animal welfare measure" (Final Determination at 6). The multi-thousand page history (see NYSCEF Doc No. 48, ¶ 3) disclosed only two minor references to health or safety (see id., ¶ 4), and "[n]owhere in the legislative record did any legislator characterize Local Law 202 as anything other than an animal welfare issue" (id., ¶ 5). This "review of the legislative record provided additional evidence that Local Law 202 is an animal welfare statute enacted for the sole purpose of affecting force-feeding practices on farms outside New York City" (id., ¶ 7; see Final Determination at 11-12).
Additional evidence that Local Law 202 was intended to protect the welfare of birds, rather than the health or safety of humans, is found within the text of the law itself. As respondents observe, Local Law 202 defines the City's sales ban by explicit reference to a farm operation that occurs within agricultural districts (see AML § 301 [11]), rather than by reference to the nutritional characteristics of foie gras or the effects of force-fed products upon humans.
As to the impact of Local Law 202, the Department determined, based upon information supplied by the Farms and the investigation of its staff, that the Farms would suffer "a significant loss of sales" and a substantial "reduction in employees" as a direct consequence of Local Law 202 (see Interim Determination at 5). The City did not challenge these findings in its Response, and it may not do so now "for the first time before the courts in an article 78 proceeding" (Peckham, 12 NY3d at 430 [internal quotation marks and citation omitted]). In any event, the administrative record amply supports the Commissioner's determination that the Farms would be severely impacted by the loss of one of its largest markets (see Final Determination at 5; see generally Tylutki Aff.). 
The Court therefore concludes that the Commissioner rationally and reasonably [*9]determined that Local Law 202 is, in purpose and direct consequence,[FN7]
a command to the Farms to discontinue a farming practice in agricultural districts to which many City residents object. But the City has no power to directly command the Farms to restructure their farm practices, and it cannot avoid review under AML § 305-a by resorting to an indirect form of regulation. 
Finally, broadly construing the literal language of AML § 305-a to extend to a sales ban like Local Law 202 would not defeat the "intent and purpose" of the statute or "lead to absurd or unreasonable consequences" (People ex rel. E.S., 40 NY3d at 235 [internal quotation marks and citation omitted]). To the contrary, the intent and purpose of AML § 305-a would be defeated if local governments lacking the direct power to impose unreasonable restrictions on farm operations within agricultural districts were allowed to do so indirectly (see Final Determination at 11). "If Local Law 202 is allowed to avoid review under AML § 305-a because it bans the sale of force-fed products rather than the practice of force feeding, it is easy to imagine municipalities using similar bans to indirectly restrict farming practices they deem objectionable or undesirable. Municipalities could ban the sale of eggs produced by caged chickens, or the sale of beef produced by corn-fed cattle" (Farms Opp at 22).[FN8]

The Court therefore concludes that there is a sound and substantial basis in the record for the Commissioner's determination that Local Law 202 falls within the scope of AML § 305-a as a "local law" that "restrict[s] or regulate[s] farm operations in agricultural districts" (Final Determination at 10-11; see Lansdown, 74 NY2d at 762).
The same conclusions follow from application of the federal precedents relied upon by respondents. Federal law also embraces the "principle that a government official cannot do indirectly what she is barred from doing directly," a point reaffirmed just a few weeks ago by the Supreme Court (see National Rifle Assn. of Am. v Vullo, 602 US ___, 144 S Ct 1316, 1328 [May 30, 2024]). And federal law supplies a robust body of precedent "consider[ing] the practical, indirect effects of legislation" in the context of sales bans and preemption statutes (Farms Opp at 22; see Final Determination at 11).
The leading federal case is National Meat Assn. v Harris (565 US 452 [2012] ["National Meat"]), which involved a California statute that "dictat[ed] what slaughterhouses must do with pigs that cannot walk" (id. at 455). The question before the Supreme Court was whether the California law was preempted by the Federal Meat Inspection Act ("FMIA") (see 21 USC § 678), which "prevents a State from imposing any additional or different — even if non-conflicting — requirements that fall within the scope of the [FMIA] and concern a slaughterhouse's facilities or operations" (National Meat, 565 US at 459-460). 
The National Meat decision devoted particular attention to "California's effort to regulate the last stage of a slaughterhouse's business": the ban on the sale of products from non-ambulatory pigs (id. at 463). The federal government conceded that the FMIA "does not usually foreclose state regulation of the commercial sales activities of slaughterhouses" (id. [internal [*10]quotation marks and citation omitted]), and proponents of the sales ban argued that it "does not regulate a slaughterhouse's 'operations' because it kicks in only after [slaughterhouse operations] have ended: Once meat from a slaughtered pig has passed a post-mortem inspection, the [FMIA] is not concerned with whether or how it is ever actually sold" (id. [internal quotation marks and citation omitted]).
The Supreme Court unanimously rejected the proponents' argument, reasoning that it "mistakes how the prohibition on sales operates within [the FMIA] as a whole" (id.):
The idea — and the inevitable effect — of the [sales ban] is to make sure that slaughterhouses remove nonambulatory pigs from the production process (or keep them out of the process from the beginning) by criminalizing the sale of their meat. That, we think, is something more than an "incentiv[e]" or "motivat[or]"; the sales ban instead functions as a command to slaughterhouses to structure their operations in the exact way the remainder of [the California law] mandates. And indeed, if the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved. That would make a mockery of the FMIA's preemption provision. Like the rest of [the California law], the sales ban regulates how slaughterhouses must deal with non-ambulatory pigs on their premises. The FMIA therefore preempts it for all the same reasons (id. at 464 [internal citation omitted] [emphasis added]).[FN9]

The City argues, however, that respondents' reliance on National Meat is misplaced, particularly following Association des Éleveurs de Canards et d'Oies du Québec v Bonta (33 F4th 1107, 1112 [9th Cir 2022] ["Canards"], cert denied 598 US __, 143 S Ct 2493 [May 22, 2023]), and National Pork Producers Council v Ross, 598 US 356 [2023] ["National Pork"]).
In contending that Local Law 202 does not "function[] as a command to [the Farms] to structure their operations" (National Meat, 565 US at 464), the City emphasizes the language in National Meat recognizing that a sales ban will not be preempted where it "works at a remove from the sites and activities" governed by claimed source of preemption (id. at 467). This language is said to have been "instrumental in the Ninth Circuit's decision in . . . [Canards], which quoted from [National Meat] to find that a sales ban on foie gras in California was not preempted by the Poultry Products Inspection Act ['PPIA']" (MOL at 15).
In Canards, the Ninth Circuit had before it the PPIA's "ingredient" preemption statute, which bars States from imposing "[m]arking, labeling, packaging, or ingredient requirements . . . in addition to, or different than, those made under [federal law]" (21 USC § 467e). The Ninth Circuit concluded that California's ban on the sale of force-fed products was not subject to ingredient preemption under the PPIA because the ban "works 'at a remove' from the slaughterhouses implicated in National Meat" (Canards, 33 F4th at 1115).
National Pork was a dormant Commerce Clause challenge to California's ban on selling products from pigs housed in inadequately-sized stalls (see 598 US at 363-364). The Supreme Court's decision in National Pork is said to have "recognized California's interest in animal welfare and in using the political process to effectuate its citizens' moral and ethical values through a sales ban" (MOL at 15).
Based on these recent decisions, the City argues that "there is no federal precedent defining a sales ban as a regulation of farm operations, nevertheless a direct regulation" (id.). Further, "[National Pork] and [Canards] demonstrate that a sales ban that operates 'at a remove' from site operations (i.e., where producers can continue to use [force-feeding] to make products but experience reduced demand from businesses in a certain location due to a local regulation) does not directly regulate site operations" (id.).
The Court does not find the City's analysis of the federal precedents or its invocation of the "at a remove" principle to be persuasive as applied to the facts and circumstances presented here. As in National Meat, a constituent unit of government banned the sale of agricultural products based on residents' disapproval of the farm practices used in production (see 565 US at 464). And the sites and activities protected by AML § 305-a, "farm operations within agricultural districts" (AML § 305-a [1] [a]), are analogous to the "slaughterhouse's facilities or operations" governed by the FMIA (National Meat, 565 US at 459-460). 
Local Law 202's ban on the retail sale of force-fed products within the City is no more removed from the Sullivan County agricultural districts where foie gras is produced than California's ban on selling non-ambulatory pigs was removed from the operations of the slaughterhouse: "The idea — and the inevitable effect — of [Local Law 202] . . . is to make sure that [the Farms] remove [force-feeding] from the production process . . . by [prohibiting] the [retail] sale of [force-fed] meat" (id. at 464). 
In contrast, Canards presented a much stronger case for the "at a remove" concept. There, "the sellers invoke[d] only the 'ingredient requirements' provision of the PPIA's preemption clause" and did "not argue[] that the sales ban affects slaughterhouse operations like the sales ban challenged in National Meat":
[T]he sellers invoke only the "ingredient requirements" provision of the PPIA's preemption clause. Of course, regulating how a food product is made could impact its physical composition. But California law is silent on what ingredients are needed to call a product foie gras. The sellers have not argued that the sales ban affects slaughterhouse operations like the sales ban challenged in National Meat. In fact, the Supreme Court differentiated the National Meat sales ban from laws like the one in this case. When a sales ban "works at a remove" from the sites and activities directly governed by federal law and does not "reach[] into the slaughterhouse's facilities and affect[] its daily activities," it is not preempted on National Meat's reasoning (Canards, 33 F4th at 1115 [internal citations omitted] [emphasis added]).
Thus, contrary to the City's argument, the Ninth Circuit's decision in Canards supports application of National Meat to Local Law 202.
And National Pork, a dormant Commerce Clause case, has no bearing on whether a State law superseding unreasonable local restrictions on farming can be avoided "just by framing [the restriction] as a ban on the sale of [products] produced in whatever way the [locality] disapproved" (National Meat, 565 US at 464). 
To be sure, National Pork did recognize the legitimacy of a government's interest in animal welfare and the use of the political process to effectuate the moral and ethical values of its residents (see 598 US at 365), but the legal issue presented in this proceeding concerns the allocation of lawmaking power between the State and its political subdivisions. 
Insofar as Local Law 202 falls within the ambit of AML § 305-a, the City's legitimate desire to protect animals from what many of its residents believe to be cruel and unnecessary suffering must give way to the State's policy of promoting its agricultural land "as a viable segment of the local and state economies and as an economic . . . resource of major importance" (AML § 300; see MHRL § 10 [1] [ii] [local laws cannot be "inconsistent with any general law"]). 
Of course, the Legislature is free to recalibrate the statutory balance to allow for consideration of the animal-welfare concerns that animated the adoption of Local Law 202, but AML § 305-a, in its current form, gives priority to the interests of agriculture, unless human health or safety is threatened.
Based on the foregoing, the Court concludes that the Commissioner permissibly exercised jurisdiction over Local Law 202 under AML § 305-a, that exercise of jurisdiction did not contravene the Municipal Home Rule Law, and the Final Determination is not otherwise arbitrary and capricious.
CONCLUSION
Accordingly,[FN10]
it is
ORDERED that the motions of (i) 350NYC, Animal Legal Defense Fund, CUNY Urban Food Policy Institute and Food Chain Workers Alliance and (ii) They All Want To Live, Inc. to appear as amicus curiae are granted, and their briefs are accepted as filed; and it is further
ORDERED that the motion of proposed intervenors Voters for Animal Rights and Animal Protection and Rescue League to intervene in this proceeding as petitioners is denied; and finally it is
ORDERED and ADJUDGED that the Petition is denied in all respects, and this proceeding is dismissed.
This constitutes the Decision, Order & Judgment of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for the State Respondents shall promptly serve notice of entry upon all parties entitled to notice.
Dated: June 21, 2024
Albany, New York
___________________________
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 1-11, 32-51, 53-67.[FN11]

Footnotes

Footnote 1:Local Law 202 was scheduled to "take[] effect 3 years after it [became] law" (NYSCEF Doc No. 2), but it remains the subject of a judicial stay entered in an action brought by the Farms against the City (see La Belle Farm, Inc. v City of New York, Sup Ct, NY County, index No. 656399/2022, NYSCEF Doc No. 61). That stay will continue pending a final resolution of this matter (see id., NYSCEF Doc No. 101).

Footnote 2:In the exercise of discretion, the Court accepts as filed the proposed amicus briefs in support of the Petition from (i) 350NYC, Animal Legal Defense Fund, CUNY Urban Food Policy Institute and Food Chain Workers Alliance (see NYSCEF Doc No. 56) and (ii) They All Want To Live, Inc. (see NYSCEF Doc No. 63). However, the motion of Voters for Animal Rights ("VFAR") and Animal Protection and Rescue League to intervene as petitioners in this matter (see NYSCEF Doc Nos. 68-82) is barred by their excessive and unwarranted delay in seeking intervention. VFAR was well aware of the issues and developments in this matter, having previously participated as an amicus in City v Ball I (see NYSCEF Doc No. 69, ¶¶ 3-4), but the proposed-intervenors did not seek to participate in this special proceeding until June 17, 2024, more than five months after its commencement and more than 45 days after the return date of the Petition.
Footnote 3:Given the comprehensive oral argument conducted in City v Ball I and two full rounds of written briefing, additional oral argument would not aid the Court in the disposition of this matter.

Footnote 4:Contrary to the Farms' contention (see NYSCEF Doc No. 33 at 13), the prior remittal for a full review of the legislative history of Local Law 202 did not resolve or otherwise pass upon this jurisdictional question.

Footnote 5:In arguing that "[t]he plain language of AML § 305-a gives the Department broad discretion in determining whether a local law 'restricts or regulates farm operations,' regardless of whether said local law has a direct or indirect impact on farm operations" (State Opp at 17), the State Respondents cited Lysander and the fact that the zoning ordinance at issue therein was a "general town zoning ordinance" (id.). However, AML § 305-a superseded the town's general zoning ordinance only "as applied to [the farm's] installation of mobile homes to house migrant farm workers" (Lysander, 96 NY2d at 561).

Footnote 6:Even California's bans on foie gras and other agricultural products are of relatively recent origin (see e.g. Cal Health & Safety Code § 25982 [enacting California's foie gras ban in 2004, with July 1, 2012 effective date]).

Footnote 7:It bears emphasis that this is a not a case where AML § 305-a is being invoked to supersede the incidental or unintended effects of a local law adopted outside of an agricultural district.
Footnote 8:Although the focus of Local Law 202 is animal welfare, it is easy to envision sales bans being based on concerns about other aspects of "farm operations," such as the treatment of farm workers or the effect of agricultural practices on the environment.

Footnote 9:To similar effect is Engine Mfrs. Assn. v S. Coast Air Quality Mgt. Dist. (541 US 246 [2004]), in which the Supreme Court held that a California rule requiring local fleet operators to purchase or lease vehicles meeting specified pollution standards constituted "the adoption . . . of a[] state or local 'standard relating to the control of emissions from new motor vehicles or new motor vehicle engines'" (id. at 251, quoting 42 USC § 7543 [a]). 

Footnote 10:To the extent not specifically addressed herein, the Court has considered the City's remaining arguments and contentions, but finds them to be without merit.
Footnote 11:The Court takes judicial notice of the prior proceedings in City v Ball I.